CHEHARDY, Judge.
The State of Louisiana, through the Department of Transportation and Development (DOTD), appeals from a judgment finding it 50 percent liable for damages suffered by plaintiffs in an intersectional vehicle collision.
Roy M. Donaldson Jr., Mary Donaldson and Eddie Bivona sued Elroy R. Giovengo, Wilmer “Pat” Anthony d/b/a A-D-S Hot Shot Service Anywhere, the defendants’ respective automobile liability insurers, and Sentry Indemnity Company — Donaldson’s uninsured/underinsured motorist insurance (U/M) carrier — for injuries resulting from an automobile collision that occurred on April 15, 1981 in Laplace, Louisiana.
Roy Donaldson alleged he was driving a 1972 Ford station wagon owned by a friend in an easterly direction on Louisiana Highway 44 (LA 44) when a 1978 Ford van, proceeding in a westerly direction on Louisiana Highway 636-3 (LA 636-3), failed to yield at a stop sign and collided with plaintiff’s vehicle. The Ford van, owned by defendant Anthony, was being operated by defendant Giovengo in the course and scope of his employment with Anthony’s delivery service, A-D-S Hot Shot Service Anywhere. Mary Donaldson and Eddie Bivona were passengers in the Donaldson car.
Anthony and Giovengo filed third-party demands against DOTD, seeking contribution and/or indemnification. They alleged DOTD failed to mark the highway properly, failed to place the stop sign sufficiently close to the intersection to put the driver on notice of where he had to yield, and allowed traffic to turn in front of oncoming traffic without proper signs on the highway itself.
The plaintiffs later amended their petition to name DOTD as a defendant. They alleged DOTD was negligent in improperly designing the highway, improperly installing semaphore traffic signals or other warning devices to alert motorists of the merging highways 44 and 636-3, failing to mark the highway with road bumps, yellow crossing marks or roadway paint to warn of the dangerous intersection, and failing to take notice of the high number of accidents at that intersection and to take corrective measures to avoid future accidents.
Sentry Indemnity Company filed a third-party demand against Anthony and Gioven-go to recover any moneys it might be liable to pay under its U/M policy. Sentry subsequently compromised the plaintiffs’ claim against it, which was dismissed.
The non-jury trial took place over three separate days, April 11, June 13 and November 5, 1984. On March 4, 1985 the district judge rendered judgment in favor of the plaintiffs. He found the State and Elroy Giovengo (“as agent for Wilmer An *185 thony”) equally at fault and apportioned the damages 50 percent to each, in solido. He ruled that Roy Donaldson had not been contributorily or comparatively negligent. The court awarded damages to Roy Donaldson in the amount of $55,114.61 ($5,114.61 special damages, $50,000 general damages); to Mary Donaldson in the amount of $100,419.22 ($10,419.22 special damages, $90,000 general damages); and to Eddie Bivona in the amount of $1,182.98 ($182.98 special damages, $1,000 general damages).
On appeal DOTD asserts the trial judge was clearly wrong in finding that the signing of the intersection had anything to do with the accident; that the trial judge committed manifest error in failing to find that Giovengo's negligence was the sole cause of the accident; that the trial judge misapplied the law of negligence; and that the damages awarded to the Donaldsons were excessive.
The evidence established that the accident occurred at 2:40 p.m. on April 15, 1981 on a dry road surface, in an area of fairly open country. It was clear daylight. Both vehicles were being driven within their respective speed limits, the van going about 30 miles per hour and the station wagon about 35. Speed was not a factor in the accident. The road surface was in excellent condition. Senior Trooper George McCoy of the Louisiana State Police categorized this location as “one of our lower accident sites.”
As shown by the photographs in evidence, the intersection is not a crossroads but rather is a merging of LA 44 into LA 636-3; LA 44 curves into LA 636-3 and they become one road, denominated LA 44. LA 636-3 follows the levee and is sometimes known as the River Road; where LA 44 merges into it, the roadway continues to follow the levee and is known as River Road. For a driver heading westward on LA 636-3, the merger appears simply a continuation of the highway he is on. Traffic on LA 636-3 has a stop sign prior to the intersection. (See Appendix, a non-scale diagram.)
Trooper McCoy said the stop sign on LA 636-3 is located about 25 or 30 feet before the intersection. The sign is visible and it is a standard-sized sign. There is no sign prior to the stop sign to warn that there is a stop ahead. He said there is a large, open triangle of land at the angle of the merger between the two highways that affords a vehicles on LA 636-3 a clear view of the traffic on LA 44.
McCoy described the stop sign as “very” visible to a driver on LA 636-3, with nothing to obscure it. He said the driver of the van (Giovengo) told him he did not see the stop sign; Giovengo told him he thought he had the right of way and the other car had cut across in front of him. The trooper also testified, however, that drivers frequently run through that stop sign; he said he could stand there all day and give out tickets. He attributed this not to poor visibility of the stop sign but rather to the local residents’ familiarity with the intersection.
Robert C. Adams, a District Traffic Operations Engineer with DOTD, testified their records showed that within the four years preceding this accident there were only two other accidents at this intersection similar to the one here. He stated this is not considered a high accident rate by any means. The most recent traffic survey done on the intersection, in February 1984, did not show any of the indications warranting installation of a traffic signal. Adams said a flashing beacon is warranted only where there are three or more accidents per year of the type that could be corrected by a flashing beacon.
As far as he knew this was the only traffic survey that had been made at that intersection since 1978 or 1979. A memo dated January 3, 1979, reporting the results of the 1978 survey, stated that State Police accident records indicated three accidents that had occurred at the intersection since 1976 were apparently caused by people running the stop sign governing LA 636-3. That memo recommended that additional curve warning signs be installed “on both LA 44 approaches,” but made no *186 recommendation regarding traffic signals on LA 636-3.
Adams said the speed limits were 35 miles per hour on LA 636-3 and 40 miles per hour on LA 44. According to him, the stop sign on LA 636-3 is unobstructed for 1,500 feet before the intersection. Because the stop sign is visible for such a distance at this intersection, he testified, a warning sign or “Stop Ahead” sign was unnecessary. Such a sign is used primarily where a driver cannot see the intersection or the stop sign. He pointed out that the Manual on Uniform Traffic Devices'by the Federal Highway Administration, upon which DOTD bases its decisions regarding placement of traffic controls, indicates a flashing beacon would not be warranted at this intersection. The manual states a beacon is warranted only “where high accident rates indicate a hazard.”
Adams admitted that at the time of the accident, the centerlane striping — two yellow “no passing” lines — extended past the stop sign into the intersection. He denied that this gave the intersection a deceptive appearance. Rather, he said, a vehicle that is going to stop is expected to pull up to the intersection to stop. He insisted that a motorist paying attention can see the stop sign. He also pointed out there is a “pronounced” change in the pavement between LA 44 and LA 636-3 and that anybody who stops can tell the difference.
Elroy Giovengo, the driver of the van, testified he was unfamiliar with the intersection and had never been there before. He had been heading westbound on River Road looking for the E.I. Dupont plant to make a delivery. He did not see the stop sign nor were there signs in advance of the intersection warning of the junction or warning there would be a stop. He did not notice that LA 44 curved into the road in front of him — the River Road looked like a straightaway to him. The road he was on looked to him like the main road. The levee was on his left.
Giovengo said he first noticed the stop sign when he saw the station wagon coming into his lane (as it traveled the curve of LA 44). He tried to avoid it by going into the left lane and saw the stop sign after-wards. He stated he did not know, when he saw the station wagon, that it had the right of way; he thought the other driver was being inattentive.
Giovengo admitted he was the cause of the accident but repeated he did not see the stop sign. He felt there should have been a warning light or warning sign, something more visible. He said a flashing yellow or red light would have been better than a stop sign.
Giovengo also said there was high grass off the side of the road and the stop sign was right by it. He could not see the curved portion of LA 44 coming from the north. He admitted the grass was not covering the stop sign, but insisted that because of the high grass he did not see either the stop sign or the merging portion of LA 44.
According to Giovengo, he first saw the station wagon when he was about 25 feet away. The wagon had just started to veer off into the curve (to its left — his right). A couple of seconds elapsed between the moment he saw the station wagon and the collision. He saw the stop sign after the accident. He said he would have stopped if he had known a stop sign was there. He also stated he had not encountered any other stop signs along River Road to that point.
Roy Donaldson Jr. testified he has often seen people running that stop sign. He is familiar with the intersection and knew he had the right of way going into the curve of LA 44.
Dr. I. Robert Ehrlich, the plaintiffs’ expert, testified by deposition. (Plaintiffs offered him as an expert in accident reconstruction, highway design and highway engineering. DOTD accepted him as an expert in accident reconstruction and highway engineering but refused to accept him as an expert in highway design. Because the trial judge did not assign any reasons for judgment, it is unknown whether he *187 found him qualified as an expert in all three areas.)
Ehrlich pointed out that LA 636-3 follows the route of the levee heading west, with the levee to the left. LA 44 heads west-to-east along the levee; at the point where it meets LA 636-3, LA 44 makes a 45-degree curve and heads north-northeast. He said the alignment of LA 44 before the intersection is parallel to the levee and directly in line with LA 636-3. Thus LA 44 and LA 636-3 appear to be the same continuous road. According to Ehrlich, the alignment of the road is the basic problem — it conveys a false impression.
He also noted that the double yellow centerlines extend 23 feet past the stop sign, then become very faded yet extend some six paces further. He felt these contribute to the false impression that LA 636-3 is continuous with LA 44.
Ehrlich said there are several signs at the intersection facing LA 636-3: 500 feet before the intersection there is a “LA 44” sign; 70 feet before the intersection is the “Stop” sign, immediately adjacent to another “LA 44” sign. Underneath the “LA 44” sign is a double-arrow sign — one arrow pointing up vertically, the other arrow pointing to the right horizontally.
Ehrlich testified that the Manual on Uniform Traffic Devices requires that the bottom of a traffic control sign be placed a minimum of five feet above the near edge of the pavement. Although the stop sign had been changed since the accident and now is at the proper height, the “LA 44” and arrow signs were the same ones. Using photographs taken at the scene of the accident and making comparative measurements, Ehrlich established that at the time of the accident the stop sign was placed some ten to 13 inches lower than it should have been. He felt the difference in height could have made a difference in visibility, especially since a driver in a van would be sitting about 4¾⅞ feet above the road surface.
He also pointed out that the Manual requires stop signs to be a minimum of six feet from the cross road. The sign here, he said, was some 70 feet before the intersection, very far from the accepted practice. He felt the unusually long distance between the stop sign and the intersection would tend to make drivers pass the stop sign to get a good look at the road, perhaps not even seeing the sign at all, especially if they have the illusion this is a continuous road. He admitted, however, that there was an unobstructed view of the sign on LA 636-3.
Ehrlich stated that when there is an unusual intersection there should be something more than just a stop sign. In his opinion, the stop should have been more clearly delineated, either by painting a white line across the roadway at the stopping point or by painting the word “STOP” across the road. He stated the stop sign here was not adequate signing, because the hazard was not self-evident. He felt the most economical and productive way to warn traffic of the stop would be to paint a white line across the roadway.
The simple fact that accidents have occurred at an intersection is not probative of their causes. Jimcoily v. State through Dept. of Highways, 361 So.2d 982 (La.App. 4 Cir.1978), writ denied 363 So.2d 1384.
The test usually applied to determine what is a dangerous defect in a public way requires determination of whether the public way was maintained in a reasonably safe condition for persons exercising ordinary care and prudence. Pickens v. St. Tammany Parish Police Jury, 323 So.2d 430 (La.1975).
“The Department of Highways is not responsible for every accident which occurs on state highways. It is not a guarantor of the safety of travelers thereon, or an insurer against all injury or damage which may result from defects in the highways. * * * It is liable for damages [under the theory of negligence] only when the evidence shows (1) that the hazardous condition complained of was patently or obviously dangerous to a reasonably careful and ordinarily prudent driver, and (2) that the department had *188 notice, either actual or constructive, of the existence of the defect and failed within a reasonable time to correct it. * * * ” Doucet v. State, Department of Highways, 309 So.2d 382, 385 (La.App. 3 Cir.1975), writ denied 312 So.2d 340.
To impose liability without fault for a defect under Louisiana Civil Code Article 2317, the injured party must prove that the thing that caused the damage occasioned an unreasonable risk of injury to another and that his injury was caused by the defect. Jones v. City of Baton Rouge, etc., 388 So.2d 737 (La.1980). “Where delictual responsibility is based not on negligence but on legal fault, under article 2317, a public body’s knowledge of the existence of the danger is irrelevant. Liability is a consequence of the fact of ownership and custody in itself, not of the breach of a duty.” Id., at 740.
A motorist is under a duty to act as a reasonable and prudent person would under the circumstances, including keeping a proper lookout, seeing what he should see, maintaining proper control of his vehicle, and observing traffic signs. Darbonne v. State Farm Mut. Auto. Ins. Co., 408 So.2d 300 (La.App. 3 Cir.1981). A driver is charged with keeping a proper lookout and must maintain control. Dabov v. Allstate Insurance Company, 302 So.2d 697 (La.App. 3 Cir.1974), writ denied 305 So.2d 539, 540.
Reviewing all the testimony, the photographic evidence and the applicable rules of law, we are compelled to reverse the district court’s finding that DOTD was liable. We find that the sole cause of the accident was the negligence of Elroy Giovengo in failing to see what he should have seen.
The evidence of prior accidents established that within the four years preceding this accident there had been only two other accidents caused by drivers running the stop sign on LA 636-3. There was no evidence to establish whether those drivers ran the stop sign deliberately or because they did not see it. In the case before us, it is uncontested that Giovengo was inattentive.
The evidence is overwhelming that the view of the stop sign was unobstructed for a long distance. Our own review of the photographs shows that the stop sign is very visible, as is its accompanying sign stating “LA 44,” with the arrows pointing ahead and to the right. The photographs taken on the day of the accident show the grass near the sign was short, although Mr. Giovengo implied the grass was high enough to obstruct his view of the sign. The speed limit on LA 636-3 was 35 miles per hour, which is slow enough for an ordinarily attentive driver to observe the traffic controls as well as the intersection itself.
Considering these elements, we cannot find this intersection posed an unreasonable risk of harm such as to impose a duty upon the state to place additional warnings prior to the intersection. We conclude the trial court was manifestly erroneous in finding that the traffic controls' at the intersection contributed to this accident. See Pitre v. Aetna Ins. Co., Inc., 456 So.2d 626 (La.1984).
Because only DOTD appealed from the judgment, and our conclusion absolves them of liability for the damages, it is unnecessary for us to discuss whether the damage awards were excessive.
For the foregoing reasons, the judgment of the district court is reversed insofar as it found the State of Louisiana Department of Transportation and Development, liable to plaintiffs. Because only DOTD appealed, in all other respects the judgment is affirmed. Each party is to pay its own costs for this appeal.
REVERSED IN PART AND AFFIRMED IN PART.
*189 APPENDIX
[[Image here]]