534 So.2d 458 (1988)
Essie Bickham WILLIAMS, et al.
v.
Danny L. ANTHONY, et al.
Michael MAGEE, et al.
v.
DEAD MAN'S CURVE, a/k/a State of La., Through the DEPARTMENT OF TRANSPORTATION AND DEVELOPMENT, et al.
Joyce HUGHES, et al.
v.
Warren L. COATES, d/b/a W.L. Coates Trucking, et al.
Oscar Lee NEWKIRK
v.
STATE of La., Through the DEPARTMENT OF TRANSPORTATION AND DEVELOPMENT, et al.
Ernest PHILLIPS
v.
DEAD MAN'S CURVE, a/k/a State of La., Through the DEPARTMENT OF TRANSPORTATION AND DEVELOPMENT, et al.
Carlos DUNN
v.
Danny L. ANTHONY, et al.
James SMITH
v.
Danny L. ANTHONY, et al.
Defisher POUNDS
v.
Danny L. ANTHONY, et al.
Nos. CA 87 0526CA 87 0533.
Court of Appeal of Louisiana, First Circuit.
August 17, 1988.
*459 Ronnie Penton, Bogalusa, for plaintiffs-appellants Michael Magee, et al.
Ray Breland, Bogalusa, for plaintiffs-appellants Essie Williams, et al.
Lewis V. Murray, III, Bogalusa, for plaintiff-appellant Carlos Dunn.
Albert L. Clark, Hammond, Dennis Pennington, Baton Rouge, Morton Katz, Michael Katz, New Orleans, Dale Branch, Bogalusa, for other plaintiffs.
Ronald Thompson, Baton Rouge, for State of La. Dept. of Transp.
Before COVINGTON, C.J., and SAVOIE and LeBLANC, JJ.
SAVOIE, Judge.
Plaintiffs in these eight consolidated suits appeal the dismissal of their claims by the trial court against the Department of Transportation and Development (DOTD). All of their claims arose out of a two vehicle accident in which three men were killed and five men seriously injured when a pickup truck carrying the eight men and a tractor-trailer rig driven by defendant Danny Anthony collided in a curve on La. Highway 21 locally known as "Deadman's Curve."
The eight men, who were all employed by Crescent Construction Company of Louisiana (Crescent), were travelling to work in a company truck driven by James Smith on December 22, 1983. Smith customarily picked up the other seven men in the Bogalusa area between 4:00 and 4:30 a.m., and drove all of them to New Orleans to their job sites. He had done so using Highway 21 for at least four years prior to the accident. On the morning of the accident, Smith was accompanied in the front seat of the pickup truck by Mickey Mosely and Newton Williams. The five remaining men rode in the back of the pickup, which was covered with a camper top: Joe Lewis, Michael Magee, Oscar Lee Newkirk, Carlos Dunn, and Ernest Phillips.
At approximately 5:30 a.m., the pickup entered a curve some two miles north of Covington on Highway 21 travelling southbound, and the tractor-trailer rig driven by Anthony which had been hauling gravel, entered the curve travelling northbound. The two vehicles collided, with the evidence indicating that the front of the pickup smashed into the passenger side of the tractor, which allegedly was in a jackknifed position across the southbound lane. The three men in the front of the pickup were killed almost instantly, although the record is unclear as to whether this was due to impact or fire; the five men in the rear of the pickup received severe injuries, and the driver of the tractor-trailer received moderate injuries.
Plaintiffs filed suit against Crescent, the employer of the eight men, and its insurer; Danny Anthony, the driver of the rig; Anthony's employer, Warren L. Coates d/b/a W.L. Coates Trucking Company of Amite, and Coates' insurer; and the State through the DOTD. All claims except those against DOTD were settled prior to trial, which was limited to the issue of liability. After hearing all the testimony and evidence, the trial judge dismissed plaintiffs' suits, holding that they had failed to prove any liability on the part of DOTD. Plaintiffs contend *460 here that the trial court was manifestly erroneous in this finding. Unable to find manifest error, we affirm.

FACTUAL TESTIMONY AND EVIDENCE
The five passengers in the pickup who survived the accident were unable to see anything because of the camper shell over the back of the pickup, and were unable to give any information about the collision except that there was no unusual movement by the pickup prior to impact.[1] The only eyewitness to the accident itself was the driver of the rig, Danny Anthony.
Anthony testified that he had driven eighteen-wheelers for twelve years as of the time of the trial, and was familiar with the curve and Highway 21 in general. Although he had only been hauling for Coates for a few weeks, he had hauled loads over Highway 21 for over a year previously. His trailer was unloaded and he was heading north of Covington to Angie for another load of sand and gravel. Anthony stated that he never lost control of his rig; that he approached the curve in seventh gear (of ten) at approximately thirty-five to thirty-seven miles per hour. He claimed that as he proceeded through the curve in his own northbound lane of travel, he saw the pickup truck coming at him in the northbound lane. When flashing his bright lights at the pickup had no effect, he steered left into the pickup's lane, rather than right towards the shoulder, in an attempt to avoid collision. He did not recall ever hitting his brakes. At a later date, when the investigating officer asked Anthony to document this oral statement made at the scene of the accident, he declined to do so based upon the advice of counsel.
Since the plaintiffs had no eyewitness to offer testimony as to the collision, they relied upon the testimony of the state trooper who investigated the accident and various experts to establish the cause of the accident. Trooper First Class Louis Ogle, who had some ten years of accident investigation experience with Troop L, testified that, based on the debris, gouge marks, and location of the vehicles after impact, the point of impact was wholly in the southbound lane. All of the experts, including defendant's expert, agreed with this opinion. Trooper Ogle further stated that his examination of the damage to both vehicles indicated that the tractor had begun to jackknife and was squarely across the southbound lane at the time of impact; it was hit near the center of the passenger side of the tractor, between the front and rear axles. The damage on the pickup indicated a head-on hit by the pickup into the right side of the tractor, rather than an angular hit. Both vehicles were knocked back to the north and west, coming to rest partly on the shoulder and in a drainage ditch on the southbound side of the road. Because the roadway was wet from both rain and diesel it was not possible to ascertain skid marks or any physical evidence of brake application by either vehicle. In the accident report, Trooper Ogle checked off violations as the primary factor causing the accident, and roadway condition as the secondary factor. Trooper Ogle explained that roadway condition can be due to manmade causes or to weather. He further explained on cross-examination that he thought that speed was a contributing factor to the accident, as it was in the other accidents he had investigated in 1983 in the curve.
Highway 21, which essentially is a rural, two lane, black-topped road, runs north-south between the Covington area and the Louisiana-Mississippi state line through St. Tammany and Washington Parishes. The section of the road in question lies between milepost markers 10.0 and 10.3, and is a 7° curve. The curve has a posted advisory speed of thirty-five miles per hour, and is marked with chevron signs. There are double yellow "no passing zone" lines in the critical portion of the curve.
Plaintiffs attempted to show, based on Trooper Ogle's testimony, that the cause of the accident was the jackknifing of the *461 tractor-trailer rig, which was due to the allegedly unreasonably dangerous curve and roadway surface at the point of the accident. They presented the testimony of residents of the area regarding the accident history of the accident site as well as the testimony of various experts on traffic engineering and accident reconstruction.
Two lay witnesses' testimony dealt with the curve's accident history and characteristics. Thomas K. Crain, a trucker with thirty years of rig-driving experience who was familiar with Highway 21 and the accident site, testified that he regularly travelled this route. He had actually driven an unloaded rig southbound through the curve on the morning of the accident shortly before it happened, at approximately 5:00 a.m. He stated that although it was not raining the roadway was wet, and that even though he took the curve at a speed of about thirty to thirty-five miles per hour, he felt his rig begin to slip as he approached the curve. He was able to proceed through the curve safely, however, and on further questioning, said that in getting through the curve, he maintained his speed, neither accelerating or decelerating. He also said that in the thousands of times he had driven through this curve, he had never been in an accident.
The deposition testimony of J. Garland Ogden, a retired general contractor, whose house lies along the northbound lane of the curve, touched upon the accident in question, but primarily focused on the accident history of the curve and the efforts made by local residents and governing authorities to improve the roadway. Ogden had been awakened by the crash and had immediately called the State Police, which he claimed he was accustomed to doing, before going out to the accident scene. He testified that he saw a gravel truck jackknifed on the opposite side of the highway and a blazing pickup truck on fire to such an extent that he didn't know the make of the pickup.
With regard to the curve's history, Ogden testified that he became aware of a problem with the road shortly after he moved into the area in the late 1940's. At that time, because of the many accidents, members of the community had erected red reflectors throughout the curve on mailboxes, fence posts, "everything we could get a hold of." Ogden recounted letters to the governor, the director of the Department of Highways, and the senator of the district which included the accident site, a petition with 1,000 signatures presented to the police juror of that area for transmission to the Highway Department, as well as verbal discussions with the two state representatives of the area; but in response, he stated, all the Highway Department ever did was to "put up a few signs on Monday morning. And then the first Saturday night they were all knocked down again." Basically, he testified that the Highway Department's response thereafter to subsequent accidents was never structural, only cosmetic. Because of the lack of success of his and the community's efforts, he gave up on trying to get anything done to the curve around 1974.
Plaintiffs questioned Bob Adams, the district traffic operations engineer for DOTD since 1971, who is responsible for making traffic studies of state roads for speed limit reductions and traffic control installations. He stated on questioning that DOTD's minimum design standards for new construction or major reconstruction of rural highways and roads call for a four-lane highway of twelve feet per lane, with ten-foot outside and six-foot inside shoulders, for highways with average daily traffic volumes of over 3,000 vehicles. Adams stated DOTD's records show the average daily traffic in 1983 on this highway was 7,910 vehicles.
Adams also testified about abnormal spot locations, which he defined as a spot on a road where the accident rate is higher than average. From 1974 through 1978, this curve did not appear in the abnormal spot check information of DOTD; in 1978, the road was resurfaced. In 1979, the curve appeared as an abnormal spot location having the second highest number of accidents in his district, with seven accidents and four fatalities. In 1979, based on an order from Adams, who was personally aware of the accidents occurring in the *462 curve, DOTD installed chevron signs in the curve. The advisory speed for the curve in 1979 was thirty-five miles per hour, as it was at the time of the accident.
In 1980, the curve was again the second highest in the district in the abnormal spot studies, with six accidents, one being a fatality. In 1981, the spot was number six in the district with five accidents, and in 1982, the spot was back up to number two in the district with seven accidents.
Adams explained that he did not receive the results of the abnormal spot studies until a year or a year and a half following the reported year; the studies were based on accident reports filed by the state police which were sent to the Department of Public Safety, then to DOTD, and finally to the particular district involved. He further said that in addition to using the abnormal spot studies to determine the safety of a road, he used ball bank testing, which determines appropriate speeds. Adams testified that ball bank testing in this curve showed that a safe travelling speed was forty-five miles per hour in good conditions, and thirty-five miles per hour in adverse conditions.
Adams testified that from 1980 on, DOTD only required him to study those areas on the abnormal spot studies where the accident rate exceeded what is known as the significant accident rate. In 1980, 1981, and 1982, the significant accident rate in the curve was not exceeded.
Plaintiffs questioned Adams as to his familiarity with a 1980 DOTD engineering directive requiring DOTD to continually test roadway surfaces to determine skid resistance and to report for corrective actions locations with a high wet weather accident rate or with a skid resistance number or coefficient of friction less than approximately thirty-five. Adams was unaware of this directive; he explained that although he could request a skid test, his department did not conduct skid tests and that another department was responsible for the testing. Adams did not request a skid test for the curve, nor had he specifically studied or reviewed the accidents on the curve to determine if there was a high rate of wet weather accidents.
Plaintiffs also questioned Shashikant C. Shah, DOTD's research and development engineer since 1981, who was a data analysis engineer with DOTD prior to that time. As the head of research and development, Shah had the responsibility of compiling inventories of the skid resistance of state road surfaces. In response to questioning about the 1980 DOTD engineering directive, Shah testified that no skid test was performed on the curve until 1985. Pursuant to a stipulation by plaintiffs and defendants, the results of this report were introduced into evidence to aid in reconstruction of the accident, and not to show negligence or fault. According to the test results, the average coefficient of friction was 33.3, which Shah said was acceptable. Shah further explained that since all skid tests are performed at forty miles per hour, the coefficient of friction would be higher at a lower speed, such as thirty-five miles per hour.
Three experts' testimony was offered by plaintiffs to establish the defective nature of the curve. The first, Duaine Evans, who testified as an expert in traffic engineering, was formerly a traffic engineer with DOTD for eleven years. Evans focused primarily on signing and warning measures for the curve. He testified that he had performed a ball bank speed test which showed a safe speed for the curve of forty-five miles per hour. He further stated that DOTD had met the minimum signing requirements of the Manual on Uniform Traffic Control Devices for the curve. However, Evans opined that additional signs and warning measures were needed for the curve, such as a "Slippery When Wet" sign or a larger arrow. He based his recommendation on his opinion that "there seems to be a large number of accidents that occur in this curve when it's wet."
When asked on cross-examination what authority he had for this conclusion, he said "I'm quite sure that's an unusual condition based on my experience." Evans further admitted that it was within an engineer's discretion to erect a "Slippery When *463 Wet" sign since the manual suggested one on a roadway which is extraordinarily slippery when wet without defining "extraordinarily" numerically. Evans also testified that these warning signs would be of greater benefit to drivers unfamiliar with the curve.
Thomas Dorsey Sullivan also testified as an expert in civil and traffic engineering and accident reconstruction. Sullivan explained that Louisiana uses a rate number method to evaluate abnormal spots, whereas he was using a rate quality control method to determine the possible dangerousness of the curve. Based on his method, he found the accident rate of the curve to be abnormally high.
Sullivan also used statistical data compiled in various nationwide studies and federal studies to compare with the statistics on accidents in this curve gleaned from the Uniform Traffic Accident reports obtained from the State Police. He stated that in a 1980 study on twenty-three states issued by the National Transportation and Safety Board regarding skid resistance programs, 13% to 15% of all fatal accidents and 18.6% of all accidents occurred on wet pavement. These figures contrasted with those of the accident reports in evidence for the curve, which showed that from 1979 through 1983, thirty-three of fifty-one accidents, or 65% of all accidents, occurred in this curve while the pavement was wet.
On cross-examination, Sullivan testified that he did not know whether Louisiana was one of the twenty-three states involved in the 1980 study, nor did he know whether these statistics involved curves; he also was unaware if the statistics indicated accidents caused by wet conditions. Sullivan also stated that Louisiana's rate number method was a recognized system for determining abnormal spots. He further said that he did not know how many states used the rate quality control method, the method which he used.
Finally, with regard to the varying rankings of the accident site on the abnormal spot checks for 1979 through 1983, Sullivan testified that it was his opinion that the fact that the accident site moved in rankings was not as important as its being on the list for three consecutive years prior to the accident in question.
Lastly, the plaintiffs called Colonel Joseph Andre, who qualified as an expert on accident reconstruction. Based upon his evaluation of the accident site from physical inspection, the wreckage of the vehicles, other measurements and factors, and reports of other accidents and a collision diagram, Andre opined that the primary cause of the accident was that the tractor-trailer began to skid, went out of control, and jackknifed. Colonel Andre estimated that the speed of the tractor-trailer was forty-two miles per hour if the pickup had been travelling at thirty-five miles per hour, and 43.7 if the pickup had been travelling at forty-five miles per hour.
On cross-examination, Colonel Andre was asked why the tractor-trailer went out of control. He speculated as follows:
Because of the fact that the pull axles on the tractor for some reason started to skid, and as it started to skid it would move to the right and lose its traction, especially in the curve itself, and the tractor would start -and the trailer would start to push it. It could have been as a result of deceleration, sudden deceleration, or it could have been because the driver hit his brakes. And it could have been partially as a result of uneven braking as a result of the load beingthe vehicle being unloaded.
When asked what proof Colonel Andre had to show that the tractor-trailer went into a skid, he gave the following reasons: the manner in which the vehicle went out of control; the way the vehicle traveled; the vehicle's final position; and the position of the vehicle when it impacted the pickup.
Colonel Andre further explained that forty percent of the braking force of a loaded rig is on the back trailer wheels; forty-three to forty-five percent is on the tractor pull axle (the two wheels on the back of the tractor); and twenty percent is on the front axle. When the rig is empty, the braking force remains the same. However, he testified, *464 [I]f you apply it on a surface with a low coefficient of friction, it could lock up that trailer['s] wheels quickly. If you were to touch your brakes or hit your brakes, it wouldn't take a lot of force to lock it up. But, again, this is going to depend on the adjustment of the brakes on the various wheels. That's a possibility. That could have been one of the problems. But it did go into a skid and it did jackknife. And more than likely it was a result
Colonel Andre elaborated on the statistics of the accident history of the curve in his analysis of the accident. He stated that his study of the collision diagrams of accidents in the curve indicated the following critical data:
(1) Ninety-one percent of the accidents involved an out-of-control car.
(2) Eighty-two percent, or forty-two of fifty-one collisions, were one-car accidents.
(3) Sixty-five percent, or thirty-three of fifty-one accidents, occurred at night, which he stated "indicates a problem with the curve."
(4) Thirty-three of fifty-one accidents occurred with northbound vehicles.
Colonel Andre did admit that as far as the nighttime accidents were concerned, other circumstances were involved such as speeding drivers, drunk drivers, objects in the road, or other vehicles. He further stated that in some of the accidents there would be several contributing circumstances.
On cross-examination, Colonel Andre testified that in his study of the accident reports, several vehicles were travelling at a high rate of speed; he also admitted that he could find no other accident wherein an eighteen-wheeler went out of control at forty-two miles per hour.
We note that with the exception of the testimony of Trooper Ogle and a portion of Colonel Andre's testimony, all other testimony of plaintiffs' witnesses related to generalities and not to the specific accident sub judice.
DOTD called one expert witness, Dr. Olin K. Dart, Jr., a consulting engineer who qualified as an expert in traffic engineering, highway design, traffic safety, and accident reconstruction. Dr. Dart did not reconstruct the accident.
Dr. Dart testified that most of the basis for his opinion in this case was defendant Danny Anthony's version of the accident. He opined there must have been some driver error to cause the accident, even if one accepted Colonel Andre's version of the accident. Dr. Dart stated:
But, again, physical evidencewise [sic], the truck can get in the same position by either his version [Anthony's], or if it's possible that things happened as Colonel Andre said ... they could get in the same position. So what I'm saying is, it could have happened either way. I don't think the physical evidence bears out a hundred and sixty foot slide at the point of collision [Colonel Andre's reconstruction]....
Although he conceded that the statistics on the curve showed an abnormal percentage of wet pavement accidents, Dart did not believe that the wet pavement contributed to the jackknife. He explained as follows:
[A]t thirty-five miles an hour, a vehicle steering in its lane does not meet any side friction at all with that super elevation. It will track that curve. The super elevation alone will keep it on the curve as opposed the centrifugal force. It's not until you get above thirty-five where the friction even comes in. So, again, unless there is some precipitating cause that causes that vehicle to get into a tight turn as Mr. Anthony suggested, or if there is some braking configuration, somehow they can precipitate a skid, I don't see a person who is normally steering down the road going out of control in that curve at thirty-five miles an hour or forty miles an hour even.
When asked about the cause of the accident, he reiterated that the eighteen wheeler should not have gone out of control without driver error. He stated:
[A]s Colonel Andre has stated and I concur, the speed estimate is probably in the *465 thirty-five to forty-five mile an hour range ... [a]nd I don't believe that a normal operation, the truck is going to go out of control. There's no evidence in the data of these accidents that any other eighteen-wheeler did that, and there's a lot of them that go through that curve under these conditions.
Dart called the curve moderate: "I don't know that I would call it sharp." Dart said that in studying the accident reports on accidents in the curve, he found that many of the accidents involved excessive speed. Although he agreed that the curve should have been studied with regard to the number of accidents when the road was wet in the data from 1979 to 1982, he did not feel that the difference between a skid number of 31 (0.31) or 38 or 35 would make much diference to a rig attempting to correct a skid.

FINDINGS OF FACT AND LAW
In his reasons for judgment, the trial judge made one express finding of credibility of a witness' testimony, that of the rig driver, Danny Anthony. The trial judge rejected Anthony's version of the accident, stating that other evidence conflicted with his testimony. We agree with this finding.
The trial court went on to find that DOTD was not strictly liable because plaintiffs did not prove that there was a defect in the curve. The trial court also determined that DOTD was not negligent; the court found that the curve was adequately signed. The trial court questioned whether DOTD should have studied the curve more closely than it did due to the high accident rate; however, the trial court found that there was no connexity between the lack of further study and this accident. The trial judge stated:
In short, it is just as possible for this accident to have been precipitated by the wet road conditions, excessive speed under the circumstances and inattentiveness of the northbound driver as it is to say that this accident could have been caused by the Department's failure to adequately study this curve and undertake remedial steps to prevent such accidents.
The findings of fact of the trial court are entitled to great weight on appeal and are not to be disturbed unless they are manifestly erroneous or clearly wrong. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). The trial judge in determining the weight to give the testimony of an expert witness has much discretion, and may base his decision on the expert's qualifications, experience, and the facts on which he bases his opinion. Orgeron v. Dobkowski, 476 So.2d 458 (La.App. 1st Cir. 1985).

STRICT LIABILITY
Plaintiffs seek recovery under both strict liability and negligence.
In order to recover under strict liability, plaintiffs must prove: that the thing which caused the damage was in the care or custody of defendant, that the thing had a vice or defectthat is, that it occasioned an unreasonable risk of injury to another and that their injuries were caused by the defect. Jones v. City of Baton Rouge-Parish of East Baton Rouge, 388 So.2d 737 (La.1980).
We agree with the trial court's finding that DOTD is not strictly liable because plaintiffs established no defect in the curve. Plaintiffs tried to establish that the curve was defective through the high incidence of accidents from 1978-1983. We initially note that none of these accidents involved eighteen-wheelers, despite the heavy gravel truck traffic on Highway 21. To accept plaintiffs' theory that this curve was unreasonably dangerous when wet and when traversed by an eighteen-wheeler travelling at approximately 35 m.p.h., one would expect to see many other accidents such as this one. Furthermore, several experts testified that the vast majority of the automobile accidents involved speeding drivers.
Plaintiffs further rely on the testimony of Thomas Crain regarding his passage through the curve prior to the accident. Yet, while Crain may have experienced difficulty *466 in the curve, he never skidded or went out of control; he was able to safely traverse the curve. Dr. Dart testified that even if he were to accept Colonel Andre's version of the accident, a truck travelling at thirty-five to forty miles per hour through this curve should not skid or go out of control without driver error.
We also note that plaintiffs did not prove that the curve had an abnormally low coefficient of friction in 1983, when the accident occurred. The only skid test run was performed in 1985, at which time the coefficient of friction was 33.3. Colonel Andre testified that one year prior, at the time of the accident, the coefficient of friction was probably higher.[2]
Plaintiffs also contend that the signing at the curve was inadequate. Yet, one of plaintiffs' own experts testified that the signs met the minimum requirements of the Manual on Uniform Traffic Control Devices. Furthermore, where a driver is familiar with a road, the lack of or inadequate warning signs have been held not to be a cause of an accident. See Kennison v. State Department of Transportation and Development, 486 So.2d 267 (La.App. 3d Cir.), writ denied, 489 So.2d 917 (1986). For these reasons, we cannot say that the trial court committed error in failing to find DOTD strictly liable.

NEGLIGENCE
For plaintiffs to recover under negligence, they must prove:
(1) that the act complained of was a cause-in-fact of the accident, (2) that the defendant had a duty, either statutory or non-statutory, to protect these plaintiffs against the cause of harm complained of, (3) that the defendant breached this duty to protect these plaintiffs, and (4) that the plaintiffs were harmed by this breach of the duty owed.
Murphy v. Louisiana Department of Transportation, 424 So.2d 344, 346 (La. App. 1st Cir.1982).
The trial court raised the issue that DOTD may have been negligent in failing to study the curve due to its presence in the abnormal spot studies; yet the lower court found that this failure was not a cause of the accident. We can not say that DOTD was negligent. When the curve first appeared on the abnormal spot study in 1979, DOTD's district engineer Bob Adams did enlarge the chevron signs. Although the curve appeared on the abnormal spot studies in 1980, 1981, and 1982, Adams was not required to examine it since the accidents at that location did not exceed the significant accident rate. Adams was not aware that there was a high percentage of wet weather accidents on the curve; accidents occurring in abnormal spot locations are not classified by their occurrences in wet or dry weather. While a 1980 directive set forth the requirement that roads be tested for skid numbers, the method for determining which roads had a high percentage of wet weather accidents was not set forth in the directive.
Even assuming that DOTD was negligent for failing to test the curve prior to 1985, we can not say that this negligence was the cause of the accident. As earlier discussed, Dr. Dart opined that even accepting plaintiffs' expert's reconstruction of the accident, the cause of the accident was driver error. We agree with the trial judge in his finding that failure to perform studies of the curve was not a cause of the accident. Thus, we find that the trial court did not err in holding that DOTD was not negligent.
*467 For these reasons, the judgment of the trial court is affirmed. Costs are assessed against appellants.
AFFIRMED.
NOTES
[1] By stipulation, the testimony of Ernest Phillips to this effect was admitted as representative of the testimony of all five men regarding lack of knowledge of the details of the accident.
[2] The trial judge did not allow plaintiffs to introduce into evidence these test results on the grounds that these tests were subsequent remedial measures undertaken by DOTD and therefore inadmissable. Plaintiffs attempted to proffer these results into evidence on the basis that the tests were not remedial in nature as such studies did not correct or attempt to remedy the situation, but merely to assess the situation on that basis and also that the tests should have been admitted to show the feasibility of doing such studies prior to the accident. The trial judge would not allow a proffer to be made; however, the test results were stipulated into evidence by counsel for both sides for the limited purpose of allowing the experts to discuss their data. If there was any error by the trial court in denying the proffer, under the circumstances such error was harmless.