576 So.2d 122 (1991)
Terry Bounds GUY, et al., Plaintiffs,
v.
STATE of Louisiana, DEPARTMENT OF TRANSPORTATION AND DEVELOPMENT, et al., Defendants.
Billy A. BROWN, et ux., Plaintiffs,
v.
STATE of Louisiana, DEPARTMENT OF TRANSPORTATION AND DEVELOPMENT, et al., Defendants.
LIBERTY MUTUAL INSURANCE CO., Plaintiff,
v.
STATE of Louisiana, DEPARTMENT OF TRANSPORTATION AND DEVELOPMENT, et al., Defendants.
Nos. 22112-CA to 22114-CA.
Court of Appeal of Louisiana, Second Circuit.
February 27, 1991.
Rehearing Denied March 28, 1991.
*123 Mayer, Smith & Roberts by Ben Marshall, Jr., Shreveport, for Terry Bounds Guy, et al., appellees.
Comegys, Lawrence, Jones, Odom & Spruiell by John S. Odom, Jr., Shreveport, for Billy A. Brown and Elizabeth W. Brown, appellees.
Cook, Yancey, King & Galloway by Albert M. Hand, Shreveport, for appellant, State, DOTD.
Jerry Kircus, Shreveport, for appellee, Liberty Mut. Ins. Co.
Frederick H. Sutherland, Shreveport, for appellee, Caddo Parish School Bd.
Gordon N. Blackman, Jr., Shreveport, for Brian D. Ball, intervenor-appellee.
Before NORRIS, HIGHTOWER and VICTORY, JJ.
HIGHTOWER, Judge.
In three consolidated actions arising from an automobile/bus collision, the State *124 of Louisiana through the Department of Transportation and Development (DOTD) appeals a judgment finding that agency sixty percent liable in each case. The automobile driver, found forty percent at fault, and his two passengers, answered the appeal by arguing that all liability should be assessed to the State. For the reasons hereinafter expressed, finding the plaintiff driver solely at fault, we reverse the assessment against the State and, accordingly, amend and affirm the judgment.

FACTS
At approximately 6:00 a.m. on February 17, 1986, Billy Brown met Brian Ball before driving to the Wal-Mart store in their home town, Vivian, Louisiana, where Burleigh Lynn Guy joined them. That day, Brown would operate his vehicle as the three men traveled approximately 15 miles to their place of work at the Universal Oil Products plant, located between Mooringsport and Blanchard, Louisiana on Highway 538.[1] Taking Highway 1 south, Brown turned right onto Highway 538 at the intersection known locally as Holland's Triangle, and proceeded southbound on the two-lane thoroughfare.
At the same time, Carolyn Pittman, a substitute driver for the Caddo Parish School Board, was operating her school bus in a northerly direction on Highway 538. The roadway being wet from falling mist, Ms. Pittman slowed her vehicle to 30-35 miles per hour as she approached a left-hand curve about three-tenths of a mile south of Holland's. In the pre-dawn darkness, she first viewed the headlights of Brown's 1979 Ford Thunderbird. As the car rounded the curve from the opposite direction, she observed it straddling the center line and heading toward her at a high rate of speed, later estimated to be 45-50 miles per hour. Immediately applying her brakes, she skidded approximately 62 feet while steering the bus as far as possible to the right, but being unable to get off the road due to an embankment next to the shoulder. The Brown vehicle struck the left front corner of the bus with sufficient impact to force it backwards seven feet. Miraculously, Ms. Pittman and her passengers escaped serious injury. The occupants of the automobile, however, were not as fortunate.
The first suit arising from the accident, filed on behalf of Guy, named the driver and DOTD as defendants. Ball later intervened. In the next cause, Brown sought recovery from the State. Finally, the uninsured motorist carrier for Guy initiated a separate subrogation action against Brown and the State. In all of these proceedings, DOTD asserted Brown's negligence as the sole cause of the mishap.
By agreement, the various cases were consolidated for trial on the bifurcated issue of liability. After hearing evidence for five days, the judge rendered a written opinion in which he apportioned fault, sixty percent to DOTD and forty percent to Brown. Subsequent to judgment, DOTD filed its appeal. All other parties ("plaintiffs") answered.

DISCUSSION

Standard of Review
The district court apparently found the highway unreasonably dangerous. Nevertheless, DOTD asserts that this ultimate conclusion should not be given the usual deference on appeal since the trial court failed to articulate a factual theory supporting its determination. In reply, plaintiffs contend that the written opinion adequately details justifications. Alternatively, they argue that, should we determine that the manifest error rule is not applicable as to the findings against the DOTD, neither should it be applied against them, the plaintiffs.
It is well established that a trial court's finding of fact may not be set aside in the absence of manifest error or clear wrongness, and reasonable inferences of fact should not be disturbed on review. Arceneaux *125 v. Domingue, 365 So.2d 1330 (La. 1978). However, when the fact-trier does not articulate the theory or evidentiary facts upon which conclusions are based, an appellate court is unable to give such findings the usual deference attributed to such decisions. Bloxom v. Bloxom, 512 So.2d 839 (La.1987); Thompson v. PetroUnited Terminals, Inc., 536 So.2d 504 (La.App. 1st Cir. 1988), writ denied, 537 So.2d 212, 213 (La.1989).
In assessing sixty percent of the fault to DOTD, the trial court termed the road as "substandard and improperly maintained" but failed to justify that conclusion. Although describing the curve as "sufficiently sharp that it tended to cause south bound vehicles to slide into the north bound lane," the opinion did not explain whether such a "slide condition" resulted from a road surface of inadequate friction, as plaintiffs contended, or from the light rain at the time of the accident. The abbreviated decision mentioned, but failed to specify, the "hazardous conditions" of the highway. Finally, in reference to a major issue of the case, regarding the existence of warning and speed signs on the road on the day of the accident, the trial judge merely stated that those "proved ... in place" were inadequate, without indicating which signs he, in fact, determined were there.
On the other hand, in reference to the plaintiff driver, the court specifically found him "negligent in approaching the dangerous curve at an excessive speed and without being able to keep his vehicle under proper control."
The fact-trier having thus particularized those acts of the driver constituting fault, we may not set aside that determination if reasonable in light of the entire record and not clearly wrong. See Rosell v. ESCO, 549 So.2d 840 (La.1989). However, lacking articulated facts in support of finding the State at fault in the accident, we now review the record to ascertain if the preponderant evidence establishes a reasonable factual basis for imposing such liability. See Thompson, supra.

Duty of the State
Of course, a driver who leaves his side of the road and collides with another vehicle in its correct lane of travel is presumed negligent. Noland v. Liberty Mutual Insurance Company, 232 La. 569, 94 So.2d 671 (1957); Smiciklas v. Groendyke Transport, Inc., 505 So.2d 775 (La.App.2d Cir. 1987), writ denied, 506 So.2d 1231 (La. 1987); Nicholson v. La. Dept. of Transportation & Development, 449 So.2d 178 (La. App. 3d Cir.1984). See LSA-R.S. 32:71, 79(1). When this presumption is applied, the burden shifts to the trespassing motorist to demonstrate the collision was not caused by his negligence, or that there were justifiable circumstances excusing his conduct. Noland, supra; Freeman v. Continental Casualty Co., 180 So.2d 112 (La.App. 2d Cir. 1965); Jackson v. Indiana Lumberman's Mutual Ins. Co., 175 So.2d 349 (La.App. 2d Cir. 1965); Bryant v. Johnson, 140 So.2d 758 (La.App. 2d Cir.1962).
To exculpate Brown from liability, plaintiffs sought to prove DOTD breached its duty to maintain the highway, where the accident occurred, in a reasonably safe condition. See Myers v. State Farm Mut. Auto. Ins. Co., 493 So.2d 1170 (La.1986). That duty includes providing adequate warnings of and safeguards against dangerous conditions in the highway. State Farm Mut. Auto. Ins. Co. v. Slaydon, 376 So.2d 97 (La.1979); Von Cannon v. State, Department of Highways, 306 So.2d 437 (La.App. 3d Cir.1975), writ denied, 309 So.2d 681, 682 (La.1975). Of course, whether DOTD breaches its duty depends upon the facts and circumstances of each individual case. Myers, supra.

Actual Condition of The Roadway
Highway 538 is a State Rural Minor Collector Route, LSA-R.S. 48:191, originally taken into the state system in 1924. With the construction of Highway 1 in the 1940's, it became a secondary roadway, although today accommodating approximately 1,800 vehicles daily. It has nominal lane widths of nine feet and narrow shoulders. For that reason, on January 27, 1986, the state director of construction and maintenance *126 listed it, and numerous other state routes, as substandard and designated for posting at ten miles per hour below the then-existing speed limit,[2] and with signs reading "Drive Carefully Substandard Roadway."
Plaintiffs contended such signs were not in place on the date of the accident. They maintained that motorists assumed 55 miles per hour to be lawful in the absence of a speed limit sign, and that Brown could not be at fault in entering the curve at 45-50 miles per hour.[3]
At trial, in support of those contentions, plaintiffs called numerous local persons who traversed this stretch of highway daily. Uniformly, they agreed a yellow diamond-shaped curve sign marked the beginning of the curve. However, their testimony proved less than consistent concerning the existence of a 45 mile per hour speed sign and substandard roadway warning for the area. Several admitted they could not recall whether the speed sign was in place on the day of the accident, but expressed certainty that the substandard sign was not. Others testified of the combined installation of both the warning and speed signs at a time ranging from two days to two months postaccident. J.R. Holland, who owned the Holland's Triangle store and land bordering Highway 538, did not notice the signs until ten months following the mishap. Another witness clearly testified that she saw the speed limit sign on the day of the accident.
Sergeant Larry Wise, called on behalf of the DOTD, supported this latter witness' observation. Employed in the Identification Division of the Caddo Parish Sheriff's Office, he participated in the accident investigation by taking pictures of the vehicles and the immediate collision site. Although none of his photographs portrayed the area of the signs, he affirmed the presence of the warning and speed limit signboards on the roadway on the accident date.
At trial, Ball, the front seat passenger, testified that he observed only the curve sign prior to the accident and assumed the speed limit was 55 miles per hour.[4] This is contrary, however, to his statements made approximately one month after the mishap to an insurance adjustor. At that earlier date, he volunteered the presence of the substandard warning and acknowledged the speed limit of the road to be 45 miles per hour.
According to the record, state highway crews write the date of installation and their initials on the reverse side of all signs at the time of posting. Photographs of the back of the contested signs reflect an installation date of February 6, 1986. To bolster that indication, DOTD presented the testimony of the two employees who actually erected the signs involved. They acknowledged that they had no independent recollection of the installation and had to rely on those dates indicated on the signs and on work orders. Plaintiffs noted that the respective work orders failed to reflect any installations in the appropriate control section[5] on the date marked on the signs. Both employees testified, however, that they had never knowingly put the wrong date on a sign. Additionally, the district maintenance engineer explained that confusion frequently arises concerning the dividing line between the two sections of this highway.
Although the photographs by Sergeant Wise do not reveal the disputed signs, those taken two days after the accident by a safety inspector for DOTD clearly do. In *127 an effort to indicate a later date for the making of the State's photos, plaintiffs presented the testimony of Debbie Tennis. Initially, this witness advised that a week after the accident she noticed men in a white, emblemed car taking pictures. However, under cross-examination, she remembered that on the date involved a section of the accident curve had previously been patched. Yet, the DOTD photographs, although encompassing the area where the highway patching occurred, do not show such repair.
Considered together, the evidence presented on this issue clearly preponderates that the 45 mile per hour sign, the substandard warning sign, and the curve sign were all in place on the day of the accident.
Plaintiffs also relied on these same witnesses to establish a "potholed" or uneven road surface, it being contended that the right tires of the vehicle struck potholes near the beginning of the curve, throwing the Thunderbird into the northbound lane and also into a slide Brown could not control. Ball told of three potholes, one and a half to two feet around and eight to twelve inches deep, appearing approximately six inches from the right hand shoulder. Some of the other witnesses agreed certain potholes existed, although descriptions ranged widely to indicate diameters of five to eighteen inches and depths of two to six inches. Others referred to the road surface as lumpy, bumpy, in poor repair, having dips or indentations, and being like a roller coaster.
During their testimony, each witness viewed a picture of the curve taken on April 29, 1986. By that date, though, the right side of the road had been patched with black asphalt. Hence, the witnesses could only point to the general area where the problem supposedly existed, rather than to the specific defect.
The State, however, presented its photographs taken two days after the accident and prior to the patch work. Although revealing an older road, the pictures show no potholes matching those described by the witnesses.
Accordingly, although not in a perfect state of repair, we do not conclude that this aspect of the road's condition rendered it unreasonably dangerous on the date of the accident.
Plaintiffs finally offered the testimony of Bob Gallaway, a registered professional engineer, and Fred Benson, past Dean of Engineering at Texas A & M, to prove that other characteristics of the curve rendered it dangerous. Gallaway appeared as an expert in tire-pavement interaction, road surface properties, pavement design and maintenance, and highway design and signage. Benson testified concerning accident reconstruction, traffic engineering, and highway and pavement design.
Initially contacted four months postaccident, Gallaway obtained a survey of the curve and visited the site. Desiring assistance in determining the reasonable speed for the curve, he contacted Benson. As a result of further investigation, they each concluded the curve was inadequately signed and had an insufficient coefficient of friction.
Visual inspection of the pavement revealed a composition of asphalt concrete. When first constructed, a roadway of this material initially has a coefficient of friction in the range of .3 to .35, comparable to that provided by outdoor carpet. But, movement of traffic across the surface creates a scrubbing action which, over a period of time, lowers the amount of friction provided by the pavement. Unable to mechanically measure the coefficient of friction in the curve, plaintiffs' experts arrived at a range of .18 to .25 by running a fingernail over the surface of the road. They compared this degree of friction to a wet pane of glass or linoleum.
Plaintiffs' two experts also found deficiencies in the superelevation or banking of the curve, based on the survey prepared after the right half of the southbound lane had been patched. Although the greater deficiencies existed in the northbound lane, Gallaway also noted an irregularity in the southbound side at a point beginning approximately 350 feet north of the impact *128 site. Comparing the actual curve to a theoretical or standard designed curve, he identified an elevation deficit of roughly one and one-half inches spread over some fifty feet in the normal path for a vehicle's left wheel. This did not indicate, however, the actual problem existing at the time of the accident. Gallaway conceded that the subsequent patching changed the superelevation, actually making the roadway more hazardous.
Combining the factors of low surface friction and deficiencies in superelevation, these experts postulated that as Brown entered the curve at 45-50 miles per hour, he lost his traction, initiating a slide into the northbound lane. Due to superelevation deficiencies there, which put an increased demand on his friction requirements, he could not regain control of his vehicle, causing him to collide with the bus in the wrong lane of travel.
Both witnesses opined that the curve should have been signed for 35 miles per hour[6] by affixing a speed advisory plate to the standard supporting the curve warning sign. But, assuming posting of the highway for a speed of 45 miles per hour, the State observed that the Manual on Uniform Traffic Control Devices does not require the utilization of such advisory "plates" for curve signs, and instead only makes such placement discretionary. Although agreeing with that interpretation, these two witnesses maintained that one must also rely on sound engineering judgment in such matters.
Gallaway's testimony conflicted with his opinion, expressed in a deposition taken approximately three months before the trial, that a reasonably prudent driver could negotiate the curve in the southbound lane at 45 miles per hour, even on a misty night. Attempting to resolve the inconsistency, he stated that "when we succeed at something, we never know how close to failure we are." From the record, we are unable to reconcile this conflicting opinion with his trial assertions.
Rather, that earlier assertion bears consistency with those views presented by the expert for DOTD, Dr. Ned Walton, a consulting engineer whose work includes design and signing of highways, roads and streets. Tendered as an expert in traffic engineering and highway design, Walton had directed his efforts at determining the overall character of the highway and the design situation at the time of the accident.
In pursuing that task, he conducted a ball bank test, the accepted method in Louisiana for determining the comfort speed for a curve. The witness defined the latter term as that speed at which the roll or movement of a passenger in a car becomes uncomfortable. The same method determines the appropriate signing of curves. Neither of plaintiffs' experts conducted this test. Instead, they maintained it could not demonstrate safe speed based on coefficient of friction, but only measured centrifugal force.
In reply, Walton testified that the safe speed is greater than the comfort speed, so that the results of the ball bank test allow a margin of safety. Furthermore, the procedure incorporates a coefficient of friction factor of .15, in addition to wet weather and relatively worn tires, as defined in guidelines provided by the American Association of State Highway and Transportation Officials.
Performing his test in June 1987, after the curve had been patched, Walton found the comfort speed to be 40 miles per hour in both directions, meaning that a motorist would not experience discomfort at that speed under the test conditions. This corresponds to the computation of Benson, who apparently relied solely on mathematical equations to calculate the comfort speed to be 40 to 47.9 miles per hour. Assuming new tires, as shown here, and increased friction, the speed at which one could safely negotiate the curve would increase, according to Walton.
Based on his findings, Walton concluded that a 45 mile per hour sign and a curve sign would provide proper signage for the *129 highway involved. Further, assuming such signing, and after evaluating all the other evidence presented, he considered the roadway in the area of the curve reasonably safe. He also opined that a motorist would not behave reasonably and prudently if he entered the curve at a normal speed, ignoring both a curve warning sign and a wet surface.
It is well settled that the State is not the guarantor of the safety of travelers on the highways, nor an insurer against all injury which may result from obstructions or defects in such highways. U.S.F. & G. Co. v. State, Dept. of Highways, 339 So.2d 780 (La.1976). See also Burkett v. Honeyman, 561 So.2d 857 (La.App. 2d Cir.1990), writ denied, 567 So.2d 613 (La.1990). Rather, it is the State's duty to construct and maintain the highways in a reasonably safe condition for persons exercising ordinary care and reasonable prudence. Coleman v. Houp, 319 So.2d 831 (La.App. 3d Cir.1975).
Based on the totality of the evidence, we cannot conclude that plaintiffs proved by a preponderance of the evidence that the roadway presented an unreasonable risk of harm such that the State bears fault for the accident.[7]
Concerning this approximate location, testimony disclosed only one prior accident involving a southbound motorist.[8] The scant evidence of that occurrence, transpiring under a permissible highway speed of 55 MPH, fails to reflect any substantial similarity to the present mishap. Certainly, if the roadway or curve were unreasonably dangerous, as plaintiffs contend, one would expect many more similar collisions. Simply that other nonsimilar accidents happen does not establish a roadway as dangerous. See Lazarus v. Southern Farm Bur. Cas. Ins., 535 So.2d 923 (La.App. 2d Cir.1988), writ denied, 536 So.2d 1201 (La. 1988); Williams v. Anthony, 534 So.2d 458 (La.App. 1st Cir.1988); Donaldson v. Giovengo, 484 So.2d 183 (La.App. 5th Cir.1986), writ denied, 486 So.2d 736 (La. 1986).
Indeed, the absence of other accidents substantially similar to this one, coupled with the volume of traffic existing over this rural thoroughfare, further supports a conclusion that this section of the roadway was not unreasonably dangerous.

Negligence of Brown
The trial court found that Brown was negligent in entering the curve at an excessive speed and failing to maintain control of his vehicle. These findings are not manifestly erroneous.
A motorist is negligent if he drives his vehicle at a speed greater than is reasonable and prudent under the conditions and for the potential hazards then existing, having due regard for the traffic on the highway, its surface and width, and the conditions of the weather. Robinson v. Estate of Haynes, 509 So.2d 128 (La.App. 1st Cir.1987).
In challenging these findings of the trial court, plaintiffs present Brown as unfamiliar with the roadway and unknowing of the alleged dangerous characteristics of the curve. Although he asserted at trial he had only driven this route to work "once or twice" before the accident, in a previous statement given shortly after the mishap, he admitted he had driven the highway "many times before." Ball also testified that Brown usually took a different road, which allowed them to avoid this section of *130 Highway 538. However, more candid in 1986, he acknowledged the route traveled on February 17 was their normal way to work.[9]
In addition to showing Brown to have been familiar with Highway 538, the evidence demonstrates he entered the curve at an excessive rate of speed under the prevailing weather conditions. Rather than slowing for the curve to accommodate the wet road surface, testimony indicated that he was proceeding at the posted speed limit or faster. Indeed, after losing control of his vehicle, Brown traveled over 300 feet uphill before striking the school bus, with no evidence that he ever attempted to apply his brakes.

CONCLUSION
The weight of the evidence establishes the accident resulted not from any defect in the highway which presented an unreasonable risk of harm, but from Brown's act of entering the curve at an excessive rate of speed and failing to maintain control of his vehicle on a wet highway. Compare Lazarus, supra.
For the foregoing reasons, the judgment of the district court is reversed insofar as it found the State liable to plaintiffs, but amended to reflect the driver, Brown, solely liable to the other plaintiffs, and affirmed as so amended. All costs of this appeal are assessed against the plaintiffs-appellees.
REVERSED IN PART AND AFFIRMED IN PART.

APPLICATION FOR REHEARING
Before NORRIS, LINDSAY, HIGHTOWER, VICTORY and BROWN, JJ.
Rehearing denied.
NOTES
[1] All three men had been employed, by contractors, at this location for several months. Brown began working there on November 5, 1985.
[2] The evidence established that prior to 1986, this section of Highway 538 did not have a posted speed limit. Accordingly, the prima facie speed limit had been 55 miles per hour. LSA-R.S. 32:61, 64.
[3] Brown has no memory of the accident. This estimation of his speed is based upon the testimony of Ball and the school bus driver, and calculations by plaintiffs' experts.
[4] The parties stipulated the inability of Guy, the back seat passenger, to testify.
[5] A control section, designating a certain segment of a roadway, is used as a management tool in maintaining records of work and costs. The control section number for the area of the curve is 078-03. The daily work reports reflect the posting of signs on February 6, 1986 in control section 078-02, immediately south of section 078-03.
[6] Such a posting would accommodate wet conditions. Indeed, Benson stated that, if dry, the curve probably was safe for speeds up to 50 MPH.
[7] The numerous exceedingly-dangerous-curve cases cited by plaintiffs are not persuasive. These present, for example, totally unmarked curves, Ledbetter v. State Dept. of Transp. & Dev., 502 So.2d 1383 (La.1987); Rodgers v. National Dealer Services, Inc., 508 So.2d 1007 (La. App. 2d Cir.1987), writs denied, 512 So.2d 1183 and 513 So.2d 1211 (La.1987); curves requiring the usage of chevron-type signs, Gadman v. State Through D. of Transp. & Dev., 493 So.2d 661 (La.App. 2d Cir.1986); Trahan v. State, Dept. of Transp. & Dev., 536 So.2d 1269 (La.App. 3d Cir. 1988), writ denied, 541 So.2d 854 (La. 1989); successive curves, Farlow v. Roddy, 478 So.2d 953 (La.App. 5th Cir. 1985), affirmed, 493 So.2d 592 (La. 1986); Gadman, supra; curves confronting a driver totally unfamiliar with the road, Ledbetter, supra; Gadman, supra; and a curve that had been the site of 72 accidents, Dill v. State, Dept. of Transp. & Dev., 545 So.2d 994 (La.1989).
[8] Two earlier accidents involving northbound drivers obviously differ from the present mishap.
[9] A motorist desiring to go from Vivian to the UOP plant may do so by one of two routes. The one taken by Brown, on the accident date, is considered shorter.