621 So.2d 41 (1993)
Christy C. COLEY, et al., Plaintiffs-Appellees,
v.
STATE of Louisiana, Through the DEPARTMENT OF TRANSPORTATION AND DEVELOPMENT, Defendant-Appellant.
No. 24,861-CA.
Court of Appeal of Louisiana, Second Circuit.
June 23, 1993.
*42 Davenport, Files & Kelly by Thomas W. Davenport, Jr., for plaintiffs-appellees.
*43 Richard Ieyoub, Atty. Gen., James G. Smith & Associates by Rosa Whitlock, for defendant-appellant.
Before NORRIS, BROWN and WILLIAMS, JJ.
NORRIS, Judge.
Christy Coley sued for personal injuries and property damage arising out of a single-car accident occurring on Louisiana Highway 557 in Ouachita Parish. The defendant, the State of Louisiana through the Department of Transportation and Development ("DOTD"), appeals the judgment finding it 85% at fault and awarding damages of $24,549.96 for the injuries sustained by Coley. Coley answers the appeal, seeking an increase in damages and arguing all liability should be assessed to the state. For the reasons expressed, we affirm.

FACTS AND PROCEDURAL BACKGROUND
On February 5, 1991, three days before her 18th birthday, Christy Coley left her home in southwest Ouachita Parish en route to Ouachita Christian School where she was completing her senior year. Because it was raining that morning, Christy left home at 7:20 a.m., 5 minutes earlier than usual. From her home, Christy took Line Road to Highway 557, where she turned and proceeded north. Shortly before reaching the T-intersection of Highway 557 and Ross Bickham Road, Christy negotiated a left-bearing curve which rounded out atop a hill. The curve was marked with a curve sign and an advisory speed limit of 45 mph; the posted speed limit for the highway is 55 mph. Upon cresting the hill, Christy saw water flowing downhill along the right side of Highway 557 from Ross Bickham Road into the northbound lane of the highway. Upon entering the water, Christy's car began to skid into the southbound lane and spun around so that the left rear quarter panel of her 1989 Mercury collided with a tree located beyond the ditch along the southbound lane of the highway.
Christy was rendered unconscious in the collision and was taken by ambulance to North Monroe Community Hospital where she was treated for a variety of injuries, the most serious of which was a blow to the head. She was released from the hospital the next day but remained under the medical supervision of Dr. Gary Jones until May 13, 1991.
Christy filed suit against the DOTD in her own name in August 1991 to recover for personal injuries and medical expenses. Her father, Joseph Coley, and their insurer, State Farm Mutual Automobile Insurance Company, were plaintiffs with subrogation claims. Joseph Coley, in whose name Christy's car was titled and registered, sought recovery for the $100.00 deductible under his collision insurance policy with State Farm. State Farm sought by subrogation $4,614.00 for the property damages, wrecker and storage expenses incurred after demand was made by the Coleys on State Farm. Plaintiffs' basic contention was that the accident and corresponding injuries were caused solely by the negligence of the DOTD in failing to properly maintain and repair Louisiana Highway 557 and the shoulders and ditches adjacent thereto.

SYNOPSIS OF TESTIMONY
Christy Coley testified that it was about two miles from her home to the accident site. She said she was going no more than 45 mph on the highway as she went through the curve; thus, she did not have to reduce her speed to comply with the advisory speed limit. She also said that she was in control of the car at all times coming out of the curve and that she lost control on the straightaway after successfully negotiating the curve. (R.p. 166)
Christy further stated that she had been driving this route to school for a year and a half and the accident site looked no different than it had on other rainy mornings. She had first noticed the accumulation of water in that area of the roadway six to nine months earlier, and she was not surprised to see water in the roadway on the morning of the accident. (R.pp. 143, 161) *44 As she came out of the curve and crested the hill, she could see water flowing along the east shoulder of the highway, starting at the area where Ross Bickham Road intersects with Highway 557. The water eventually flowed into the northbound lane of the highway, making a circular puddle which covered 1/3 to ½ of the northbound lane. Although she stated that nothing prevented her from driving around the pooled water, she said that she had previously driven at the same speed through similar amounts of water on this part of the roadway without incident. (R.p. 158) On the morning of the accident, however, she heard a "splash" as her tires rolled through the water in the roadway. She stated that she had control of the car before the splash but had no control after the splash. The car began to spin and ultimately ended up crossing the southbound lane and striking a tree that stood beyond the ditch.
Christy testified that photographs of the roadway taken on a rainy day depicted the road as it appeared on the morning of the accident, except less water was present in the photos. (Ex. P-2a & b).
Harry Lowery, a State Trooper, investigated the accident. He estimated it occurred at 7:25 a.m. He stated that it was raining at the time and that water was present on the road surface when he arrived on the scene at 7:47 a.m. He estimated Christy's speed at 55 mph but admitted that he based this estimate on general observations of damage to the vehicle. (R.p. 77) He determined the cause of the accident to be a failure to maintain control and indicated on the accident report that Christy was exceeding a safe speed limit. While noting that the posted speed limit for the highway was 55 mph and the advisory speed limit in the curve was 45 mph, Trooper Lowery stated that the safe speed limit could vary depending upon the road conditions. He stated that in this particular case, a safe speed limit would be whatever speed would have permitted Christy to negotiate the curve and maintain control. (R.pp. 82-84) However, he could not specify the safe speed limit for these road conditions.
He also examined photographs of the accident scene taken under conditions similar to those existing on the morning of the accident; he testified that with water draining from the shoulder into the northbound lane of the highway, the road was not in a safe condition. (R.p. 69) He did not recall telling Christy's mother that "hydroplaning" caused the accident.
Arlene Coley, Christy's mother, stated that she discovered Christy's car in the ditch while driving to work shortly after Christy had left for school. She arrived at the scene before Trooper Lowery and found Christy sitting in the front seat of her car in a dazed state. Mrs. Coley had been aware that water was draining from the shoulder into the northbound lane of the highway at the accident site for several months, possibly a year. (R.p. 89) She confirmed that the photos she took of the scene a few days after the accident depicted water draining from the shoulder into the northbound lane of the highway. (Ex. P-2a & b) She also stated that Trooper Lowery went to the hospital after the accident and said that Christy had "hydroplaned."
Christy's father Joe Coley came upon the accident site at approximately 8:00 a.m. on his way home from work. Christy had already been taken to the hospital, but her car remained in the ditch. He testified that the northbound lane of the highway was completely covered with water even though the rain had "slacked off" by the time he arrived. (R.p. 130) He stated that ditches and culverts in the area of the accident were stopped up and did not permit rainwater to drain properly. He also stated that the shoulder of the highway was higher than the road's surface. Mr. Coley further testified that he had been aware of water draining into the roadway for nine months to a year. (R.p. 117)
The deposition of Ronald McKneely, DOTD's District Maintenance Engineer for the Fifth Highway District, was offered in lieu of his testimony at trial. McKneely is in charge of the maintenance of all roads and bridges in the state highway system *45 for the nine northeast parishes of Louisiana. Ouachita Parish lies within McKneely's district. He stated that Highway 557 had been last overlaid in 1985, and that the road surface was in good condition. He said that no complaints had been filed with the DOTD about ditches overflowing in the area of the accident; nor had anyone complained about losing control because of water in the roadway. (Dep., 18) He inspected the accident site on the morning of his deposition, April 28, 1992. Based on this inspection, he did not feel that any of the shoulder maintenance functions listed in the DOTD's Maintenance Planning Manual, particularly Function 442 (reshaping a shoulder) were needed.[1] (Dep., 13) However, after examining photographs of the accident scene as it appeared in February of 1991 under rainy conditions, McKneely changed his mind and concluded that a problem with the shoulder did exist and that Function 442 would be the method to use to correct the problem. (Id., 33-37) The problem, as he described it, was that through erosion a ridge of sediment had gradually built up along the edge of the highway, causing the shoulder to be higher than the road surface. (Id., 36-37) The mailman may have hastened this process by pulling up to a mailbox on the shoulder, leaving a shallow rut behind. The high shoulder prevented the surface water from draining properly. McKneely explained that surface water is supposed to drain from the road surface onto the shoulder which should be sloped downward from the edge of the roadway. He noted that because the shoulder at the accident scene was higher than the road surface, water was actually draining from the shoulder onto the roadway. Moreover, the water on the roadway was prevented from flowing eastward onto the shoulder and, instead, flowed down the northbound lane. (Id., 35) This type of problem, stated McKneely, was the very thing that his Parish Maintenance Superintendent, Vernon Trichell, was supposed to look for on his biweekly survey of the state highways in Ouachita Parish.
Trichell, whose duties include inspecting state highways and scheduling maintenance work, testified at trial that he inspects each of the parish's state highways on a biweekly basis. However, he drives on Highway 557 weekly. (R.p. 191) He inspects the roads in rainy as well as in dry weather. One of the maintenance problems he looks for is high shoulders. He stated that a high shoulder holding water on the road would require immediate attention and that such a shoulder would have to be cut down if its height extended two to three inches above the pavement. (R.p. 176)
After examining photographs of the accident scene, Trichell testified that water was not draining as it should at that location. (R.p. 194) The shoulder of the highway, he said, should be sloped downward from the pavement to the ditch, causing water to drain from the road outward into the ditch. Rainwater at the accident site, however, was draining downward from the shoulder into the roadway. (R.p. 195) Nevertheless, Trichell stated that he did not consider this condition noteworthy. Indeed, he admitted that he had probably seen this condition on a previous inspection of the highway and had chosen not to make note of it. (R.p. 196)
Trichell further admitted that possibly half an inch of water was draining onto the road where the mail carrier's vehicle had apparently left a rut. Although he considered this amount of water sufficient to cause a driver to hydroplane, he did not consider this a dangerous condition. (R.pp. 185-87)
Donald Tolar, DOTD's District Traffic Operations Engineer, testified that the signing of Highway 557 was in compliance with all requirements of the DOTD's Manual on Uniform Traffic Control Devices. (R.p. 217) He stated that there are three warning signs to northbound drivers between *46 the highway's intersections with Line Road and Ross Bickham Road. The first sign is a crossroad warning sign; next, a "school bus stop ahead" warning sign; and, finally a left curve warning sign with an advisory speed plate of 45 mph. The advisory speed, said Tolar, is for daytime dry weather conditions. Just as a heavy rain would dictate a slower speed than the standard 55 mph limit, so would it dictate a speed slower than 45 mph in the curve. (R.p. 217)
Upon viewing photographs of the accident site, Tolar stated that rainwater was draining from the shoulder into the roadway. He said that this was not desirable drainage and that the shoulder should slope away from the edge of the highway. (R.pp. 222-23) He further stated that the rainwater in the roadway had not all fallen on the road but had drained onto the road from the shoulder. (R.p. 224)
The trial court found that DOTD was negligent for failing to correct the condition of the east shoulder of the highway which permitted water to accumulate and drain onto the roadway. The court concluded that the condition of the shoulder was unreasonably dangerous and that DOTD should have been aware of the condition's continued existence. It therefore found the state liable, but attributed 15% fault to Christy for failing to reduce her speed below 45 mph on a curved and obviously wet road. The court then described Christy's injuries and awarded her $20,000 in general damages and $4,549.96 in medical expenses. These damages were to be reduced by 15%. Subrogation claims were awarded to Joe Coley and State Farm in amounts that are not contested.

DOTD's LIABILITY
The DOTD asserts that the highway and shoulder were not in an unreasonably dangerous condition. In the event the highway and shoulder were in an unreasonably dangerous condition, the DOTD asserts that it did not have notice of that condition. Thus, it argues the trial court erred in finding the DOTD negligent.
The state is not the guarantor of the safety of travelers on the highways, nor an insurer against all injury which may result from obstructions or defects in such highways. U.S.F. & G. Co. v. State, Dept. of Highways, 339 So.2d 780 (La.1976); Guy v. State, Dept. of Transp. and Dev., 576 So.2d 122 (La.App.2d Cir.1991). Rather, it is the state's duty to construct and maintain the highways in a reasonably safe condition for persons exercising ordinary care and reasonable prudence. Guy, supra; Bush v. State, Dept. of Highways, 395 So.2d 916 (La.App.2d Cir.), writ denied, 399 So.2d 609 (1981). This duty applies not only to the highway surface, but extends also to highway shoulders. Sinitiere v. Lavergne, 391 So.2d 821 (La.1980); Rue v. State, Dept. of Highways, 372 So.2d 1197 (La.1979). Whether the state has breached its duty will depend on the facts and circumstances of each case. Manasco v. Poplus, 530 So.2d 548 (La.1988); Roberts v. State, Through DOTD, 576 So.2d 85 (La. App.2d Cir.), writ denied 581 So.2d 685 (1991).
A plaintiff may proceed against the DOTD under theories of negligence or strict liability. Liability based upon negligence is imposed only when the DOTD is actually or constructively aware of a hazardous condition and fails to take corrective action within a reasonable time. Sinitiere, supra. The same showing must be made when proceeding under a theory of strict liability. La.R.S. 9:2800.
As the trial judge noted, most of the jurisprudence in this state concerning hazardous highway shoulders involves scenarios in which the driver inadvertently strays from the roadway onto the shoulder and then abruptly steers the vehicle back onto the roadway with disastrous results. See Sinitiere, supra; Rue, supra; Hood v. State, through DOTD, 587 So.2d 755 (La. App.2d Cir.), writ denied, 590 So.2d 81, 82 (1991); Roberts, supra; Rochelle v. State through DOTD, 570 So.2d 13 (La.App 3d Cir.1990). Jurisprudence involving vehicular accidents caused by the improper drainage of water from the shoulder into the roadway is exceedingly rare. As our *47 brethren in the fourth circuit have noted, an accident due to an accumulation of water is not an everyday occurrence and is not as common as accidents which result from pot holes or obstructions found in the roadway. Simoneaux v. Davis, 397 So.2d 835 (La.App. 4th Cir.1981).
The DOTD cites Lazarus v. Southern Farm Bureau Cas. Ins., 535 So.2d 923 (La.App. 2d Cir.), writ denied 536 So.2d 1201 (1988), in support of its argument that the highway and shoulder did not present an unreasonably dangerous condition or defect. In Lazarus, the plaintiff lost control of his vehicle after encountering a wet highway during a rainstorm. While the testimony was conflicting as to the adequacy of the road's design and maintenance, there was absolutely no evidence to suggest that rainwater had drained from the shoulder onto the roadway at the area where plaintiff lost control. The plaintiff managed to establish only that the roadway was wet due to the direct fall of rainwater onto its surface. We affirmed the trial court's ruling that the plaintiff failed to prove the accident resulted from any defect in the highway which presented an unreasonable risk of harm. We did not there consider the condition of a highway shoulder, such as that presented in the instant case, which directly channels water onto the roadway. Lazarus is therefore distinguished from the instant case.
Here, the photographs taken of the highway under conditions similar to those existing on the morning of the accident plainly show that water was draining from the shoulder onto the road. Moreover, each of the three DOTD employees admitted that the pooled water on the road surface had drained from the highway shoulder. Vernon Trichell even admitted that the amount of water in the roadway was sufficient to cause a motorist to hydroplane. All of the employees acknowledged that the shoulder was higher than the road surface and that this not only prevented rainwater from draining from the road, but actually caused water to flow onto the roadway. They each stated that this was not the way the drainage was supposed to work.
Based upon these facts, we cannot say that the trial judge was manifestly erroneous in concluding that the condition of the highway shoulder was defective and posed an unreasonable risk of harm to motorists by causing the accumulation of water in the roadway. See Stobart v. State through DOTD, 617 So.2d 880 (La.1993); Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).
The DOTD further argues that even though the highway shoulder may have been unreasonably hazardous, the Department had no notice of this condition and thus should not be held liable. The trial judge noted, and plaintiff does not dispute on appeal, that plaintiff conceded the DOTD had no actual notice of the shoulder's condition. Donald Tolar testified that from January 1, 1985 to July 1, 1991, only one other accident had occurred on that portion of Highway 557; that accident occurred in the southbound lane during dry weather. Moreover, both Christy Coley and her parents admitted that they had never filed a complaint with the DOTD regarding the accumulation of water on the highway. Indeed, the Department introduced into evidence its complaint records which demonstrated that no complaints had been lodged about any hazardous condition at the location of the accident. (Ex. D-6).
However, the trial court found that plaintiffs had established that the DOTD had constructive knowledge of the condition of the shoulder. Each of the Coleys testified that water frequently accumulated on the highway when it rained. Their combined testimony established that rainwater had been draining onto the road from six months to a year. Vernon Trichell testified that he drove on Highway 557 once a week, inspecting the road for various hazards, specifically including high shoulders. He stated that he inspected roads in rainy weather as well as in dry weather and that he had probably seen how water was draining at the accident site but deemed it unnoteworthy. Trichell further stated that two DOTD crew members traveled the highway *48 on a daily basis on their way to and from work. Additionally, DOTD records showed that during the year preceding the accident, Trichell had scheduled maintenance work within 2½ miles of the accident site on ten separate occasions. (Ex. P-19a-f). Five of these work locations were within one mile of the accident site. Furthermore, on 12 separate occasions during the year preceding the accident, work crews were actually working within two and ½ miles of the accident site. (Ex. P-20)
Governmental bodies are held to a standard of reasonable prudence and care in discovering hazards. Briggs v. Hartford Ins. Co., 532 So.2d 1154 (La.1988). Given Trichell's duty to inspect state highways for high shoulders at least every two weeks, coupled with his virtual admission that he had seen rainwater draining into the road at the accident site, we cannot say that the trial court committed manifest error in concluding that the DOTD had at least constructive notice of the shoulder's hazardous condition and was therefore negligent. Stobart, supra.

COMPARATIVE LIABILITY
The trial court found that Christy Coley was negligent in proceeding through the standing water without reducing her speed and fixed her share of liability at 15%. The DOTD argues that the lower court should have assigned more fault to Christy. Conversely, Christy contends that she is free from fault and that the DOTD should bear complete responsibility for the accident. The trial court's finding is not manifestly erroneous.
A motorist is negligent if she drives her vehicle at a speed greater than is reasonable and prudent under the existing conditions and for the potential hazards, having due regard for the traffic on the highway, its surface and width, and the conditions of the weather. Guy v. State, Dept. of Transp. and Dev., supra.
The evidence clearly established that Christy was familiar with the conditions of Highway 557. She testified that she had been driving to school for 1½ years prior to the accident and that this was her usual route to school. She also stated that she was familiar with the tendency of rainwater to accumulate at the accident site. Indeed, she admitted that she knew on the morning of the accident that there would be water on that section of the road. Nonetheless, she never slowed her speed, proceeding through the curve and into the water at 45 mph.
Donald Tolar testified that the 45 mph advisory speed limit posted for the curve applied to dry weather conditions. He explained that a posted speed limit, advisory or otherwise, does not indicate that a driver should maintain that speed under adverse road conditions.
In Watson v. State Farm Fire and Cas. Ins. Co., 469 So.2d 967 (La.1985), the supreme court set out the factors to be considered in apportioning comparative fault:
(1) whether the conduct resulted from inadvertence or involved an awareness of the danger;
(2) how great a risk was created by the conduct;
(3) the significance of what was sought by the conduct;
(4) the capacities of the actor, whether superior or inferior; and,
(5) any extenuating circumstances which might require the actor to proceed in haste without proper thought.
Considering these factors, in light of the facts mentioned above, we find no manifest error in the trial court's apportionment of fault: 85% to the DOTD, 15% to Christy Coley.
The DOTD further asserts, however, that the trial court erred in refusing to permit Trooper Lowery to testify that he issued a traffic citation to Coley for failure to maintain control. This testimony, argues the DOTD, would tend to establish a greater degree of fault on the part of Coley. It suffices to say that evidence of the issuance of a citation, without some accompanying evidence of actual guilt, is irrelevant to the issue of negligence. The trial court was not plainly wrong in refusing to *49 permit testimony regarding the citation. Ruthardt v. Tennant, 252 La. 1041, 215 So.2d 805 (La.1968); Bertoli v. Flabiano, 116 So.2d 76 (La.App. 1st Cir.1959).

DAMAGES
Christy Coley's injuries and corresponding treatment were well described by the trial court in its reasons for judgment. Christy was briefly rendered unconscious by the accident. She was taken by ambulance to North Monroe Community Hospital where she remained until the following day. She had a large bruise over her left eyebrow, numerous abrasions, and minor cuts on her face and right hand.
Christy was treated on the day of the accident by her family doctor, Dr. Patrick Gary Jones; Dr. Jones is also Arlene Coley's employer. His immediate diagnosis was a concussion with multiple abrasions and contusions. Christy displayed symptoms of nausea, loss of appetite, blunted affect, dizziness, and weakness. These symptoms are consistent with a concussion. Dr. Jones continued to treat Christy, following her release from the hospital, until May 13, 1991.
Christy's first office visit to Dr. Jones was on February 9, 1991. She complained of nausea, dizziness, and neck muscle pain. Dr. Jones prescribed pain medication for the neck pain. Christy returned to the doctor on February 25, 1991. On this occasion, she complained of continuing headaches, insomnia, blurred vision, and nasal and sinus congestion. Dr. Jones attributed the congestion to the contusion on the left side of Christy's face with secondary infection. He attributed her headaches to the concussion and neck muscle strain. He prescribed further medication. He also administered an injection of cortisone to alleviate the neck muscle soreness and swelling.
Christy's next office visit was on March 4, 1991. Her primary complaints were vision problems and headaches. She specifically complained about difficulty reading and focusing her vision. Dr. Jones ordered an MRI which was performed on March 11, 1991 and yielded normal results. Christy returned to Dr. Jones on March 18, 1991, still complaining of difficulty sleeping. The doctor prescribed medication to alleviate the insomnia.
On April 1, 1991, Christy informed Dr. Jones that she was sleeping better but was still experiencing daytime headaches. She also complained of tenderness in the neck muscles. On visits on April 1, 1991 and May 13, 1991, Christy advised Dr. Jones that she was feeling better. However, she did complain of a "popping" sound in her neck.
Due to Christy's persistent problems with her vision, Dr. Jones referred her to Dr. Joseph Humble, an ophthalmologist. Dr. Humble examined Christy on March 13, 1991. Dr. Larry Blackmon, an optometrist, also examined Christy's vision on November 25, 1991. Both Dr. Humble and Dr. Blackmon found that Christy had a slight myopia (Dr. Humble rated her vision 20/25 in each eye.) but no other visual impairments. Neither thought the myopia was related to the accident. Dr. Jones, however, attributed Christy's vision problems to the concussion suffered in the accident since the eyes themselves were otherwise normal. The trial court concluded that Christy's visual impairment was indeed caused by the accident and awarded her $20,000 in general damages.
The DOTD contends that the trial court gave too much weight to the testimony of Dr. Jones in concluding that Christy's visual impairment was caused by the accident.
Whether an accident caused a person's injuries is a question of fact which should not be reversed on appeal absent manifest error. Housley v. Cerise, 579 So.2d 973 (La.1991). Christy Coley and her parents each testified that she had excellent vision before the accident. Following the accident, Christy's vision has become blurred. She must sit closer to the blackboard at school and has difficulty distinguishing facial features. Our supreme court has considered the difficult task of determining whether a plaintiff's disability is caused by a particular accident and has concluded:

*50 [a] claimant's disability is presumed to have resulted from an accident, if before the accident the injured person was in good health, but commencing with the accident the symptoms of the disabling condition appear and continuously manifest themselves afterwards, providing that the medical evidence shows there to be a reasonable possibility of causal connection between the accident and the disabling condition.
Id. at 980 (quoting Lucas v. Insurance Company of North America, 342 So.2d 591 (La.1977)).
The DOTD essentially argues that Dr. Jones's testimony was insufficient to establish a reasonable possibility of causal connection between the accident and Christy's visual impairment. The DOTD bases its argument upon the general proposition that the testimony of a specialist is entitled to greater weight than that of a general practitioner when the subject at issue involves the specialist's field. See Martin v. Emerson Elec. Co., 437 So.2d 910 (La. App.2d Cir.1983); Clark v. State Farm Ins. Co., 520 So.2d 860 (La.App. 3d Cir. 1987).
However, even more basic than the above proposition is the proposition that a trial court, after weighing and evaluating the medical and lay testimony, may accept or reject the opinion expressed by any medical expert. The trial judge should evaluate the expert testimony according to the same rules as apply to other witnesses. The trial court is not bound by expert testimony. It may substitute its own common sense and judgment for that of an expert witness where, in the opinion of the trier of fact, such substitution appears to be warranted by the evidence as a whole. The trial court's evaluation of expert and lay testimony will not be disturbed unless found to be clearly wrong. Lloyd v. TG & Y Stores Co., 556 So.2d 629 (La.App.2d Cir.1990).
While Drs. Humble and Blackmon are specialists in the area of vision, Dr. Jones was Christy's primary treating physician. He saw her on a continuing basis from February 5, 1991 to May 13, 1991. Drs. Humble and Blackmon examined Christy only once. The trial court, based upon its evaluation of credibility, simply found Dr. Jones's testimony to be more persuasive. While the question was close, we cannot say the trial court was clearly wrong to accept Dr. Jones's opinion and find that Christy's visual impairment was caused by the accident.
Finally, the DOTD asserts that the trial court awarded an excessive amount in damages. Christy Coley asserts that the damages award is inadequate.
The assessment of monetary damages is discretionary with the trial court and a judgment cannot be disturbed by a reviewing court absent a clear showing of abuse of discretion. La.C.C. art. 1999. The determination of whether the trial court abused its discretion in assessing damages must be based upon the peculiar facts of each case and with due regard for the fact that the trial court is in the best position to evaluate the credibility of the witnesses. It is only after an articulated analysis of the facts and circumstances peculiar to the case and the individual that a reviewing court may determine that an award is inadequate or excessive. Lloyd, supra; Hunt v. Board of Supervisors of LSU, 522 So.2d 1144 (La.App.2d Cir.1988).
The question for the appellate court is not whether a different award may have been more appropriate but rather whether the trial court's award can be reasonably supported by the record. While both the DOTD and Christy Coley have referred this court to damage awards granted in other cases, we must first reach a determination that the trial court abused its discretion before a resort to prior awards is appropriate. Lloyd, supra; Red v. Taravella, 530 So.2d 1186 (La.App.2d Cir.1988).
At the time of trial, Christy was still complaining of headaches and vision problems. Considering the particular facts and circumstances of this case, and applying the standard of review noted above, we find the trial court's award of $20,000 in *51 general damages was neither excessive nor inadequate.

CONCLUSION
Accordingly, the judgment of the trial court is in all respects affirmed. Costs of appeal are assessed 15% to Christy Coley. The other 85% is not assessed. La.R.S. 13:4521.
AFFIRMED.
NOTES
[1] It is worthy of note that McKneely's inspection of the accident site came after four DOTD employees had spent an eight-hour day working on the ditch at the Ross Bickham Road intersection. (Dep., 28-29) This work, which involved the use of a Gradall and two dump trucks, was ordered in response to Christy's accident. (R.p. 198)