645 So.2d 268 (1994)
Timothy FAULKNER, et al., Plaintiff-Appellee,
v.
STATE of Louisiana, DEPARTMENT OF TRANSPORTATION & DEVELOPMENT, Defendant-Appellant.
Brenda Kaye WATSON, Individually and as Natural Tutrix of the Minor, Tina Kaye Watson, Plaintiff-Appellee,
v.
MADDEN CONTRACTING CO., INC., et al., Defendant-Appellant.
Nos. 25,857-CA, 25,858-CA.
Court of Appeal of Louisiana, Second Circuit.
October 26, 1994.
Writ Denied January 27, 1995.
*270 Richard Ieyoub, Atty. Gen. by Bobby L. Culpepper, Sp. Asst. Atty. Gen., Jonesboro, for defendant-appellant, State of La.
*271 Brittain & Sylvester by Russell L. Sylvester, Natchitoches, for plaintiff-appellee, Timothy Faulkner.
Kent Gill, Shreveport, for plaintiff-appellee, Tina Kaye Watson.
Before MARVIN, SEXTON, VICTORY and BROWN, JJ., and JONES, J. Ad Hoc.
SEXTON, Judge.
Plaintiffs, Timothy Faulkner and Tina Kaye Watson, were injured when Faulkner drove his father's 1981 Honda Prelude off the end of an incomplete and unopened section of Interstate 49. Faulkner and Faulkner's father filed suit against the State of Louisiana, through the Department of Transportation and Development (DOTD) and against three private contractors who were working that section of I-49, along with their respective insurers. Brenda Kaye Watson Skyles filed suit against the same defendants on behalf of her minor child, Tina, who was fifteen at the time of the accident. The two actions were later consolidated. Settlement was reached between the plaintiffs and the private contractors, leaving the DOTD as the sole defendant. Following a bench trial, the court held that the DOTD was solely at fault and awarded damages to the plaintiffs. The DOTD has appealed, and the plaintiffs have answered. For the reasons that follow, we amend the judgment of the trial court in part, reverse in part, and affirm in part.
Between 7:00 and 7:30, on the evening of Friday, February 5, 1988, Timothy Faulkner drove his father's 1981 Honda Prelude to the house of his friend, Bill Lewis. Lewis was at his home with his fifteen-year-old girlfriend, Tina Watson. Around 8:00 p.m., the trio decided to spend the night at a camp owned by a friend of Faulkner's father, apparently without the consent of the owner. The camp is located about ten miles south of Frierson, Louisiana, off of Highway 175.
The group went to the camp in Faulkner's car. Faulkner testified that he parked the car just off of the highway, requiring them to make a 30-minute walk to the camp. After unsuccessfully attempting to gain entry to the camp by manipulating the locked back door entry with a stick, the idea was given up. At around 10:00 p.m., the trio headed back to Shreveport on Highway 175.
When he reached the junction of I-49 and Highway 175, Faulkner testified that he saw a vehicle exiting from the southbound exit ramp of I-49. Based on this observation, Faulkner testified that he presumed that I-49 was now open.[1] Faulkner turned left onto the entrance ramp of I-49 traveling north.
There were no traffic signs such as those typically seen around interstate entrance ramps which indicate the direction and point of entry to the interstate. On the other hand, there were no signs or barriers at the point of entry to the entrance ramp indicating that the road was closed. Nevertheless, once Faulkner turned onto the northbound entrance ramp of I-49, he encountered three large concrete barriers located at the point of convergence of his lane and the other entry lane for cars entering the same northbound entrance from the opposite direction on Highway 175. Just past the convergence of the two entry lanes, two of the barriers were askew such that it was possible to drive between them and continue on the entrance ramp and access the interstate. Exhibit F-12 is a photograph of this scene taken some five days after the accident. It accurately depicts the placement of the barriers, but Faulkner contends that the "ROAD CLOSED" sign placed beside the barriers was absent the night of the incident. The state maintains that the sign was present.
Faulkner and his passengers traversed some eight miles or more on the unopened roadway before the accident in question occurred. Bill Lewis was in the passenger seat. Tina Watson sat between Lewis and the console, probably partially on both. Apparently none of the occupants of the vehicle were wearing seat belts.
The first four miles of their trek was on Project 12. Although unopened for public traffic, Project 12 was virtually finished with all of its road striping completed. The state, *272 through the DOTD, had accepted that portion of the interstate from its contractors.
Project 12 connected with Project 13. At the time of the accident, Project 13 only had about four miles of paved highway and had not been accepted by the state from its contractors. This portion of the interstate was not nearly as complete as Project 12. It had no striping. Much of the roadway had no shoulder, leaving a 10-inch drop-off on each side. Two bridges had no completed side railingsonly steel reenforcement bars where the concrete railing would be. Photographs and testimony reveal that machinery was parked along the interstate the night of the accident, although there is conflicting testimony about whether it was actually parked on the interstate such that it would force circumnavigation. There were also some wooden barricades, which may have at least partially blocked one lane of the interstate, although, again, the testimony is conflicting.
Travelling at least 60 miles an hour, the Faulkner vehicle plunged off the interstate into a dirt embankment. There were no skid marks on the pavement indicating any attempt was made to brake the vehicle. Although the testimony is confusing, it appears that there was at least one wooden barricade about 100 feet before the end of the pavement, but it apparently was only in one lane and was placed parallel with and not perpendicular to the roadway. All three occupants of the vehicle were injured. In addition to suffering cuts and bruises, Timothy Faulkner injured his left eye, which at the time of the accident filled with blood causing temporary blindness in that eye. Tina Watson suffered from a broken ankle.[2] The trio left the vehicle and went to a nearby house for help. From there the police were notified of the accident.
A state trooper arrived at the house, interviewed the plaintiffs, and investigated the scene of the accident that night. Based upon answers by the plaintiffs to his questioning, the trooper believed Faulkner entered I-49 at the incompleted Stonewall-Frierson entrance ramp in Project 13. The state trooper investigated the unopened interstate only as far back as the Stonewall-Frierson entrance rampnot as far back as the point of entry (six additional miles) claimed by the plaintiffs in this lawsuit.
Suit was filed by Timothy Faulkner and his father, Charles Faulkner, against the three contractors constructing Project 13, Madden Contracting Co., T.L. James, and Louisiana Paving Co., their respective insurers, and against the state, through the DOTD. A similar suit was filed by Brenda Kaye Watson Skyles, individually and as natural tutrix of the minor child, Tina Kaye Watson. By the time the case went to trial, Tina was a major and substituted herself as plaintiff in place of her mother. The DOTD filed cross-claims against the contractors, but these claims were later dismissed when settlements were reached in the main demand between the plaintiffs and the contractors.[3]
Plaintiffs based their claims against DOTD, the sole remaining defendant, in strict liability and negligence. DOTD answered alleging 100 percent fault on the part of the plaintiff and, alternatively, third party fault on the part of the contractors. DOTD also claimed that it did not have custody or control of Project 13, the site of the accident.
Following a bench trial, the trial court rendered judgment in favor of the plaintiffs and against the DOTD. Timothy Faulkner was awarded damages in the amount of $81,526.80. Charles Faulkner was awarded $3,000.00 for damage to the vehicle. Tina Watson was awarded $238,443.79 in total damages, this amount representing the sum of several items of damages ($317,925.06), reduced by 25 percent as a result of a finding of comparative negligence on her part for riding partially on the console and partially in the lap of her boyfriend in violation of LSA-R.S. 32:282.
DOTD appeals the judgment asserting the following assignments of error:
1. The trial court erred in finding that the plaintiffs met their burden of proof under LSA-R.S. 9:2800, particularly as *273 to the care and custody of the highway in question.
2. The trial court erred in awarding excessive damages for pain and suffering to the plaintiffs.
3. The trial court erred in awarding Timothy Faulkner damages for lost wages.
4. The trial court erred in failing to apportion fault and/or negligence between Madden Contracting Company, Inc., T.L. James & Company, Inc., and Louisiana Paving Company, Inc.
5. The trial court erred in failing to find Timothy Faulkner at fault.
Both plaintiffs answered the appeal. Tina Watson alleges the trial court erred in finding comparative fault on her part and in failing to award her damages for loss of earning capacity. Timothy Faulkner answers the appeal requesting additional damages.

LIABILITY OF DOTD
We first consider the issues regarding the liability of DOTD. The trial court concluded that the DOTD was strictly liable under the provisions of LSA-C.C. Art. 2317 as modified with respect to public entities by LSA-R.S. 9:2800. LSA-R.S. 9:2800 provides that a public entity cannot be held strictly liable under LSA-C.C. Art. 2317 unless it has actual or constructive notice of the defective condition that caused the damages prior to the occurrence of the incident and the public entity has had a reasonable opportunity to remedy the defect and has failed to do so. Valet v. City of Hammond, 577 So.2d 155 (La.App. 1st Cir.1991); see generally, Kent v. Gulf States Utilities Company, 418 So.2d 493 (La.1982).
Hence, the elements necessary to impose liability upon a public entity based on a defective condition of a roadway are now the same whether based on negligence or strict liability. Under either theory, the plaintiff must prove: (1) that the defendant owned or had custody of the thing which caused the damage; (2) that the thing was defective in that it created an unreasonable risk of harm to others; (3) that the defendant had actual or constructive knowledge of the defect or risk of harm posed thereby and failed to take corrective measures within a reasonable time; and (4) causation. Valet v. City of Hammond, supra.
The trial court found that the plaintiffs proved all the elements under LSA-R.S. 9:2800. Specifically, the court found that DOTD had custody of Project 13 and the unfinished portion of the interstate where the accident occurred. The court found that the unwarned, abrupt end of the pavement posed an unreasonable risk of harm to others. The court also found that the state had ample notice that people were driving on the unopened interstate and failed to take the necessary corrective steps to stop the public from entering the interstate at the entrance in question.
The DOTD contends that the trial court erred in finding that the plaintiffs had proved the elements of LSA-R.S. 9:2800, particularly that it had control or custody of the thing that caused the damage. The argument is based upon the contention that because the state had not accepted that portion of I-49 where the accident occurred, i.e., Project 13, custody and control was still held by the contractors. The trial court obviously struggled with this issue, but ultimately found that the plaintiffs carried their burden of proving that the DOTD had custody of Project 13 on the rather strained rationale that the DOTD failed to place markers or signs on the interstate indicating where Project 12 (of which the state clearly had custody) ended and Project 13 began.
We find that it is unnecessary to decide if the DOTD had custody or control of Project 13, or more specifically, the site of the accident, in order to impose liability on the state. While the unheralded, abrupt end of the highway may have indeed been a cause of the accident, it is obvious in this case that this was not the sole cause of this accident. This accident would not have occurred if the plaintiffs had not entered the unopened interstate at Highway 175. We have no trouble finding that the failure of the DOTD to effectively sign and barricade the entrance to the unopened section of the interstate known as Project 12, of which the state indisputably had custody and control, gave rise to the *274 accident and the resulting injuries suffered by the plaintiffs. This omission was surely a cause of the accident.
For purposes of liability under LSA-R.S. 9:2800, however, it must still be shown that the failure to properly sign and barricade the entrance to I-49 constituted an unreasonable risk of harm to others. In deciding whether something presents an unreasonable risk of harm, the court must weigh the magnitude and the probability of injury against the burden of preventing the injury. Entrevia v. Hood, 427 So.2d 1146 (La.1983); see also, Matt v. Cox, 478 So.2d 918 (La.App. 1st Cir.1985), writ denied, 479 So.2d 913 (La.1985).
In Entrevia, the supreme court held that the defendant owner of an abandoned farmhouse was not liable to a trespasser who was seriously injured when she fell through the back steps of the farmhouse, where the defendant had placed a fence and "NO TRESPASSING" sign around the property. Under the circumstances of that case, the court reinstated the trial court's finding that the imperfections of the steps did not constitute an unreasonable risk of harm to others. The building was isolated and the trespassers knew their presence on the property was unauthorized. The court believed that to impose a burden requiring total destruction or high level restoration on owners of such buildings is not socially or economically desirable. The magnitude of the risks posed and the gravity of harm threatened by the condition typically associated with rundown old farmhouses is small in comparison to other risks presented by things in our society. Entrevia, supra.
This is not to say, however, that the unwarned and abrupt end of the pavement where the accident occurred was, as found by the trial court, unreasonably dangerous for purposes of strict liability. The risks of injury posed by the hazards of unfinished roadways and construction sites are obvious. Nevertheless, the fact that a thing creates a hazard does not necessarily mean it is unreasonably dangerous for purposes of imposing strict liability. Entrevia, supra.
The trial court relied on Stephens v. State Through Department of Transportation, 440 So.2d 920 (La.App.2d Cir.1983), writ denied, 443 So.2d 1119 (La.1984), to find that the unwarned, abrupt end to the pavement of this highway construction site constituted an unreasonable risk of harm. This case does not assist the trial court's conclusion, however. In Stephens, the nature of the hazard posed was not an "end" to the highway. The hazard there was inadequate warning of highway workers repairing potholes on an open interstate.
In the case at bar, the interstate was closed to public traffic. The hazards associated with incompleted and unopened highways are inherent and self-evident. Under these circumstances, to impose a burden of requiring the state or a road construction contractor to make an unfinished and unopened construction site safe for public traffic each day (an impossible feat) or to require the state or its contractors to warn unauthorized motorists at every hazardous point on an unfinished and unopened highway under construction of the numerous and extensive hazards posed at the highway construction site is simply not feasible nor economically desirable in terms of utility, where effective barricading and signing could be accomplished at the points of access.
Nevertheless, unlike the circumstances in Entrevia, where the plaintiffs were fenced out and warned that their presence on the property was trespass, the plaintiffs in this case were not barricaded out. Also, the trial court finding that the "ROAD CLOSED" sign (if not altogether absent) was inadequate cannot be said to be clearly wrong. Weighing the magnitude of the hazards posed by an incomplete section of interstate highway against the ease with which the DOTD could have clearly warned against and possibly prevented entrance by the public at the point of access requires a finding that the condition of the unopened entrance to I-49 at Highway 175 was unreasonably dangerous. Thus, following the Entrevia analysis in the case at bar, we hold that the failure to properly barricade the entrance and adequately warn motorists with signs indicating that the interstate was closed constituted an unreasonable risk of harm to others.
*275 The final element under LSA-R.S. 9:2800 requires a showing that the defendant had actual or constructive notice of the defect and a reasonable opportunity to remedy the defect, but failed to do so. The statute defines constructive notice as the existence of facts which infer actual knowledge. LSA-R.S. 9:2800(C). At trial, plaintiffs attempted to show actual or constructive notice by testimony to the effect that numerous people were using the interstate at that intersection around the time of the accident, and the state had done nothing to prevent it.
As it relates to the instant case, the fact that the plaintiff presented testimony that people were using the interstate around the time of the accident is really of no moment, since such vehicles could have gained access to the interstate at any number of points by driving around legally sufficient barriers where adequate notice that the road was closed was posted.[4] Hence, it is not knowledge or notice to the state of the fact that people were unlawfully driving on the unopened interstate that the plaintiffs needed to show in this instance. It was the state's knowledge or notice of the condition of the instant improperly barricaded and signed entrance ramp that the plaintiffs must actually show, for it was the condition at that point that made this "thing" unreasonably dangerous.
The barriers which were askew were large concrete barriers often used in major highway construction projects to channel traffic and to blockade entrances and exits where necessary. They are obviously of great weight and clearly have to be moved with heavy machinery. It is undisputed that the state was responsible for properly barricading this portion of the interstate.
Considering the size of the barriers, it seems obvious that these large, heavy concrete barriers could only have been moved with heavy machinery by the state or its agents. We think this circumstance, in and of itself, is sufficient to equate to constructive notice on the part of the state.[5]
Accordingly, we affirm the judgment of the trial court in finding that the state of Louisiana was liable for the injuries sustained by the plaintiffs as a result of the accident, albeit for the somewhat different reasons stated hereinabove.

ALLOCATION OF FAULT
For the reasons that follow, however, we amend the judgment of the trial court regarding the fault of Timothy Faulkner and reverse the finding regarding Tina Watson.
Defendant/appellant asserts that the trial court erred in failing to find fault on the part of Timothy Faulkner. We agree. The state is not the guarantor of the safety of travelers on the highways, nor an insurer against all injury which may result from obstructions or defects in such highways. Rather, it is the state's duty to construct and maintain the highways in a reasonably safe condition for persons exercising ordinary care and reasonable prudence. Coley v. State, Through DOTD, 621 So.2d 41 (La. App.2d Cir.1993). An individual driver owes a duty of being reasonably observant of conditions that either might affect the operation or use of his vehicle that would pose an unreasonable risk of harm to others. This *276 duty includes the duty to use his automobile reasonably and to maintain a proper lookout for hazards which might pose an unreasonable risk of harm. Thomas v. Petrolane Gas Service Ltd., 588 So.2d 711 (La.App.2d Cir. 1991), writ denied, 590 So.2d 1201 (La.1992); Foster v. Lafayette Insurance Co., 504 So.2d 82 (La.App.2d Cir.1987), writs denied, 505 So.2d 61, 65 (La.1986).
The mere fact that Timothy Faulkner was able to get on the interstate does not absolve him from fault when, once he got on the entrance ramp, there were obvious indications that should have indicated that the interstate was closedeven if, in fact, he ever believed it was open to public traffic. First, there were no signs indicating that the interstate was open. By this we mean the typical signs located around interstate entrances indicating the name of the interstate and the direction of the entrance ramp. Second, once Faulkner turned on the entrance ramp, the presence of the barriers tilted askew at the junction of the two northbound entrance lanes should have at least sent up a red flag in Faulkner's mind that the interstate might indeed be closed. Third, once on the interstate, the absence of other vehicles should have put him on further notice that something was amiss. Finally, the total absence of striping, the presence of roadside machinery and other obvious features such as unfinished bridges, no road shoulders, and wooden barricades in Project 13 should have at least caused Faulkner to consider that he was on a closed road. Instead, he continued down the highway at sixty plus miles per hour before plunging off the end of the pavement. At best, we can characterize his driving judgment as negligent; at worst, he exhibited a reckless disregard for the safety of himself and his passengers.
State Trooper R. P. Johnston, who investigated the scene the night of the accident, testified that not only should it have been obvious to the plaintiffs that the interstate was not open to the public, it was general knowledge that it was not open. Trooper Johnston also opined that Faulkner was driving too fast considering the condition of the road.
At the very least, it is abundantly clear that Timothy Faulkner breached his duty of being reasonably observant of the conditions of the interstate on the night of the accident. Accordingly, we hold that the trial court's finding that Timothy Faulkner was not at fault is clearly wrong.
Hence, we shall analyze the degree of fault and the extent he may recover from the state under the principles of comparative negligence. LSA-C.C. Art. 2323; Lamaire v. Motor Convoy, Inc., 625 So.2d 638 (La.App. 3d Cir.1993), writ denied, 632 So.2d 754 (La. 1994). In apportioning comparative fault, this court has applied the factors enumerated by our supreme court in Watson v. State Farm Fire and Casualty Insurance Co., 469 So.2d 967 (La.1985):
(1) whether the conduct resulted from inadvertence or involved an awareness of the danger;
(2) how great a risk was created by the conduct;
(3) the significance of what was sought by the conduct;
(4) the capacities of the actor, whether superior or inferior, and,
(5) any extenuating circumstances which might require the actor to proceed in haste without proper thought.

Coley, supra at 48.
Furthermore, since the fault of the state in this case is pursuant to LSA-C.C. Art. 2317 and LSA-R.S. 9:2800, we must also consider whether reducing the negligent plaintiff's recovery would serve as an incentive for similarly situated plaintiffs to exercise care, while not reducing the incentive of the owner of the thing to remove the risk of harm. Sistler v. Liberty Mutual Insurance Co., 558 So.2d 1106 (La.1990).
The trial court assessed the defendant with 100 percent fault. Having found that determination clearly wrong, it becomes our task to set the state's liability at the highest we can affirm under the circumstances of the case. Starnes v. Caddo Parish School Board, 598 So.2d 472 (La.App.2d Cir.1992). After considering the factors set forth above, we conclude that the maximum degree of liability assessed against the state that we *277 can affirm is 60 percent. There is no question that the DOTD owes a duty to erect barricades, signs, and adequate warnings to alert the motoring public of extremely dangerous, trap-like hazards, unusual obstructions, perilous conditions, or defects in the road. However, whether a required warning is reasonable or adequate is determined by the place where the danger exists, the nature of the road, and the general situation and circumstances surrounding it. Poland v. Glenn, 623 So.2d 227 (La.App.2d Cir.1993), writ denied, 629 So.2d 1171 (La.1993).
As we noted, it seems virtually impossible for one paying any attention at all to proceed past the askew barriers without having a serious question as to whether the interstate was open. A simple glance at Exhibit F-12 indicates something is amiss. Even if Faulkner mistakenly thought the interstate was open, once he was on it, he could have prevented this accident by reasonably observing the conditions of the roadway and proceeding cautiously to a safe exodus. We conclude that a reduction in Faulkner's award by 40 percent will serve as an incentive to other similarly situated plaintiffs to exercise reasonable care on the highways, while at the same time assessing 60 percent fault on the state should provide it with an incentive to maintain highway construction sites in a reasonably safe condition.
As to Charles Faulkner's recovery for property damage to the vehicle, Plaintiff Timothy Faulkner is a "phantom tort-feasor"[6] and Charles Faulkner's recovery should be reduced in accordance with plaintiff Timothy Faulkner's degree of fault. LSA-C.C. Art. 2324; Devereux v. Allstate Insurance Co., 557 So.2d 1091 (La.App.2d Cir.1990).
The trial court found that Tina Watson was 25 percent at fault in causing the accident for riding partially on the console and partially in the lap of her boyfriend in violation of LSA-R.S. 32:282. On appeal, she alleges this is error. We agree.
LSA-R.S. 32:282(B) provides: "No passenger in vehicle shall ride in such a position as to interfere with the view of the driver to the front, sides or rear of the vehicle or to interfere with his control over the driving mechanism of the vehicle." Although it is clear that Miss Watson was riding in the front seat with Bill Lewis, the trial court found that she was riding in such a way that the view of Timothy Faulkner was obstructed.
The record does not support this finding. There is simply no evidence, testimonial or otherwise, to indicate this circumstance obstructed Faulkner. Moreover, in its reasons for judgment regarding the alleged comparative fault of Timothy Faulkner, the trial court specifically stated:
Additionally, while it is clear that three persons occupied the front portion of the car where only two were in fact to be seated, it cannot be said that this in and of itself is negligence. There is no evidence that shows that Mr. Faulkner was distracted from his driving or interfered with in way [sic] by this situation.
Nor is there any evidence that her damages were caused or increased by riding in the front seat. Accordingly, the finding of the trial court that Tina Watson was 25 percent at fault is clearly wrong and will be reversed.
Defendant/appellant alleges that the trial court erred in not apportioning fault between the three contractors working on Project 13 and with whom both plaintiffs had reached a settlement. This assignment of error has no merit. While it is true that a plaintiff's settlement with one solidary obligor (or several) reduces his recovery against the non-settling tort-feasor by the percentage of fault of the released solidary obligor(s), this applies only where the remaining defendant proves at trial that the released party(s) was a joint tort-feasor, and therefore solidarily liable. Taylor v. USF & G, 630 So.2d 237 (La.1993); Raley v. Carter, 412 So.2d 1045 (La.1982).
DOTD failed to prove at trial any fault on the part of the released parties. The only evidence approaching this point was testimony *278 that the state had not yet accepted Project 13 from its contractors. This fact is of no moment, however, since the liability of the contractors for purposes of comparative fault is not based on custody or control under LSA-C.C. Art. 2317, as is the state's liability, but of fault under LSA-C.C. Art. 2315. See Roberts v. State, Through DOTD, 576 So.2d 85 (La.App.2d Cir.1991), writ denied, 581 So.2d 685 (La.1991). It is settled that the state cannot delegate to its contractors its responsibility to maintain its highways in a reasonably safe condition. Roberts v. State, Through DOTD, supra. Hence, the state must affirmatively show fault on the part of its contractors to claim a reduction in its own liability. Taylor v. USF & G, supra. No such evidence was adduced other than that just mentioned. Accordingly, this assignment of error is without merit.

DAMAGES
Both DOTD and Timothy Faulkner complain that the trial court erred in the amount of damages awarded to Faulkner for pain and suffering. DOTD seeks a reduction while Faulkner seeks an increase. DOTD also complains that the award to Tina Watson was excessive.
Before a trial court award for damages can be questioned as inadequate or excessive, the reviewing court must look first, not to prior awards, but to the individual circumstances of the instant case. A damage award should not be disturbed by the review court absent a showing of a clear abuse of discretion vested in the trial court. It is only after an articulated analysis of the facts discloses an abuse of discretion that resort to prior awards in similar cases is proper. Reck v. Stevens, 373 So.2d 498 (La. 1979); Jackson v. A.L. & W. Moore, 609 So.2d 1064 (La.App.2d Cir.1992). The award is then "disturbed" only to the extent of lowering it (or raising it) to the highest (or lowest) point as the case may be within the reasonable discretion or range afforded a trial court. Foster v. Lafayette Insurance Co., supra.
In addition to awarding the past and future medical expenses prayed for and lost wages, the trial court awarded Timothy Faulkner $75,000.00 general damages for pain and suffering and permanent injuries (occasional blurred vision). Faulkner's injuries were primarily to the left side of the face involving the left eye and a cut on the ear. The injury to Faulkner's eye was characterized by his treating physician, Dr. Lusk, as a serious injury. There was blood in the anterior chamber of the globe of the eye, indicating a laceration of the globe, although no laceration was found. There was plastic, other foreign bodies, and bone fragments removed from under Faulkner's eye lids. The cuts around the eye and the ear were sutured. Faulkner spent three days in the hospital. Dr. Lusk stated that a blunt injury of this type is mildly painful, but usually not severely painful.
With respect to his eyesight, at his initial examination after the accident, Faulkner could see only light. On his discharge three days later, Faulkner could see fingers at 10 feet. Five days after the injury, his vision had improved to 20/200; that is, what most people could see at 200 feet, Faulkner could clearly make out at 20 feet. Eleven days after the accident, his eyesight improved to 20/60. By mid-March, about five weeks after the accident, Faulkner had 20/40 vision. On June 6, 1988, four months after the accident, Faulkner's vision had improved to 20/30, acceptable vision for driving without corrective lenses.
Ultimately, Faulkner's vision improved to 20/25 in both eyes. Since there was no injury to the right eye, he probably had 20/25 vision prior to the accident, at least in the right eye. Dr. Lusk said that 20/25 was excellent vision. Dr. Lusk also said Faulkner's vision could be corrected to 20/20 with a small lens correction. As far as long term effects, Dr. Lusk said that there was about a 10 percent increased chance that Faulkner would contract glaucoma later in life and a very small increased chance of cataracts.
When we consider the seriousness of the injuries against the amount awarded by the trial court, we cannot say that the $75,000.00 award is too high, as defendant contends, or too low, as plaintiff contends, so as to constitute *279 an abuse of the discretion afforded the trial court.
Likewise, when we consider the seriousness of the injuries sustained by Tina Watson, we cannot say that the amount awarded by the trial court, $317,925.06, was so high as to constitute an abuse of discretion. Tina Watson suffered from serious multiple fractures to her left foot, in addition to some lacerations to her face. Although most of the fractures healed without complications, the ankle joint has degenerative arthritis due to the trauma. This has caused Tina occasional pain, and according to her treating physician, will eventually result in the necessity of having the ankle fused within the next five years (ten years from the accident). Once this is accomplished, Tina will walk with a permanent limp. There is also a fairly severe scar remaining from the ankle injury that apparently causes Tina embarrassment and occasional problems from her shoe rubbing against it.
We also note that inasmuch as Tina Watson has settled with Timothy Faulkner, a joint tort-feasor and hence a solidary obligor in this instance, her award must be reduced by the percentage of fault attributed to Faulkner. LSA-C.C. Art. 1803. Taylor v. USF & G, supra.
Defendant/appellant also complains that the trial court erred in awarding plaintiff Timothy Faulkner $125.00 in lost wages because the award is based solely on testimonial evidence. An award for past lost earnings, which are susceptible of mathematical calculation from documentary proof, is not subject to the much discretion rule. Where no documentary evidence such as ledger sheets and payroll records are provided to show the time and extent of an injured plaintiff's commercial endeavor with any degree of certainty, a trial court may not award damages for the economic loss. Eddy v. Litton, 586 So.2d 670 (La.App.2d Cir.1991), writ denied, 590 So.2d 1203 (La.1992). We therefore amend the judgment of the trial court eliminating the award for lost wages in the amount of $125.00.
Finally, Tina Watson asserts that the trial court erred in failing to award her damages for loss of earning capacity. The trial court found that the plaintiff failed to mitigate her damages and, more importantly, that the record was "devoid" of any evidence that she was prohibited from any employment she was or should have been able to do but for the accident.
An award for loss of earning capacity encompasses the loss of one's earning potentialthe loss or reduction of a person's capability to do that for which he is equipped by nature, training and experience, and for which he may receive recompense. Rodgers v. National Dealer Services, Inc., 508 So.2d 1007 (La.App.2d Cir.1987), writs denied, 512 So.2d 1183, 513 So.2d 1211 (La.1987). Damages for impairment of earning capacity cannot be calculated with certainty, and the trial court must be accorded broad discretion in assessing them. However, there must be a factual basis in the record for the award. Starnes v. Caddo Parish School Board, 598 So.2d 472 (La. App.2d Cir.1992)
After the accident, Tina Watson dropped out of school (ninth grade) and never returned. The last grade she completed was the eighth grade. Her own testimony indicated that her failure to return to school probably had as much, if not more, to do with her family life than with the accident. She has held few jobs. She admitted she has difficulty getting along well with other people. She complained she has difficulty standing for long periods of time due to her ankle. At the time of trial, she was employed at the Piccadilly Cafeteria as a food server. Her manager stated that due to her ankle problems, she initially had some trouble getting around fast enough in the eating area picking up trays, so she was moved to the food serving area. He praised her highly as an employee, stating she had a good personality and was good with customers.
Upon our review of the record, we cannot say that the trial court finding that Tina Watson has failed to establish her entitlement for damages for loss of earning capacity is clearly wrong. Hence, we affirm the trial court denial of these damages to Tina Watson.

*280 DECREE
In accordance with this opinion, we amend the judgment of the trial court to read as follows:
IT IS HEREBY ORDERED, ADJUDGED AND DECREED that:
I. There be judgment herein for plaintiff, TIMOTHY FAULKNER, and against defendant, STATE OF LOUISIANA, for damages in the amount of Forty-Eight Thousand, Eight Hundred Forty-One and 08/100 Dollars ($48,841.08) ($81,401.80 reduced by Timothy Faulkner's 40 percent measure of fault), together with legal interest thereon from date of judicial demand until paid;
II. There be judgment herein for plaintiff, CHARLES FAULKNER, and against the STATE OF LOUISIANA, for damages in the amount of One Thousand Eight Hundred and No/100 Dollars ($1,800.00) ($3,000.00 reduced by 40 percent), together with legal interest thereon from date of judicial demand until paid;
III. There be judgment herein for plaintiff, TINA WATSON, and against the STATE OF LOUISIANA, for damages in the amount of One Hundred Ninety Thousand, Seven Hundred Fifty-Five and 03/100 Dollars ($190,755.03) ($317,925.06 reduced by 40 percent of the fault assessed to joint tort-feasor, Timothy Faulkner, with whom plaintiff, Tina Watson, settled), together with legal interest thereon from date of judicial demand until paid; and
IV. The defendant, STATE OF LOUISIANA, to pay all costs of these proceedings, to the extent allowed by law.
AMENDED IN PART, REVERSED IN PART, AND AFFIRMED IN PART.
BROWN, J., concurs and dissents with written reasons.
BROWN, Judge, concurring and dissenting.
I question reversing the trial court's determination of Faulkner's fault. The entrance to the interstate was not blocked. Once on the interstate, Faulkner initially traveled on Project 12, which was "virtually finished." Although I may not agree, I cannot say that the trial court was clearly wrong.
NOTES
[1] In fact, at this point in time I-49 was still under construction and had never been opened.
[2] Apparently, Bill Lewis was injured, but the record does not indicate to what extent.
[3] Lewis apparently settled his claim without suit.
[4] It is apparent from the photograph of the site of the concrete barriers on the entrance ramp at Highway 175 that a path had been worn by vehicles driving off the road shoulder and around the barriers, even when the barriers were properly placed. This fact was corroborated by the testimony of Ranson Knipe, a foreman responsible for inspection of barriers for the DOTD. Mr. Knipe testified that he saw numerous vehicles driving around the barriers onto the interstate for weeks prior to the accident. He testified that it was difficult to tell whether they were vehicles of construction workers going to the job site or unauthorized vehicles. He claims he reported unauthorized vehicles to the state police, and that he also notified his superiors.
[5] Just how long prior to the accident the barriers were moved is unknown. The barricade inspector's testimony that the barriers were in place the evening of the accident does not seem credible, inasmuch as this witness's testimony was contradicted by testimonial and photographic evidence. Further, it was confusing at best in that he testified there were no concrete barriers at the site in question, only wooden barricades. We also know that five days after the accident, based upon the date of the photograph, the state still had done nothing to correct the situation.
[6] See David W. Robertson, Solidary Liability In Tort: Understanding Gauthier and Touchard, LOUISIANA BAR JOURNAL, Dec. 1993, at 334.